UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF NEW HAMPSHIRE

_____

Kevin Rocheville                          :
                                          :
v.                                        :
                                          :
Thomas Goulden,                           :
Matthew Keenliside,                       :          Civil Action No. 19-CV-01169-AJ
Allison Caprigno, and                     :
Town of Pelham, NH                        :
_____:

### DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

### INTRODUCTION

On October 18, 2016, Pelham police executed a search warrant at Plaintiff's home. The search was the culmination of a weeks-long investigation into suspected violations of RSA 644:8 – the state's animal cruelty statute.  The investigation was triggered by reports from the director of an animal rescue operation and Plaintiff's ex-girlfriend, who stated that there were as many as 35 adult dogs, mostly mixed pitbull breeds, plus several newborn puppies at the home.  At the time of the search 10 adult dogs and eight puppies were located in the residence, all suffering some degree of illness or neglect, ranging from hookworm and Giardia to open sores and fecal scalding.  The house smelled of urine and ammonia and there were urine stains and feces in several rooms.  Plaintiff was charged with ten counts of neglect.  After several months, during which the parties entered into an agreement on further care for the dogs, the charges were dropped.

Plaintiff now claims that the charges were the result not of a careful investigation by Pelham Animal Control Officer (and Defendant) Allison Caprigno, but as part of an ongoing conspiracy to harass him originated by one-time officer (and Defendant) Thomas Goulden.

Defendants deny any such conspiracy and do not believe any evidence will be brought forward to support such a claim.  More importantly, for purposes of this Motion, the undisputed facts establish that the charges were supported by probable cause, defeating his claims of conspiracy or violation of his Substantive Due Process rights and myriad state law claims that turn on probable cause.  Finally, Plaintiff has not alleged facts sufficient to support a claim for defamation.  For all these reasons, as more fully developed below, Defendants are entitled to summary judgment.

## STATEMENT OF UNDISPUTED MATERIAL FACTS

### *Background*

Plaintiff was – and is - a resident of the Town of Pelham.  Plaintiff's Deposition ("Pl. Dep."), relevant portions of which are attached hereto as <u>Exhibit A</u>, at 5.  In approximately 2000 or 2001 he built a house at 31 Jonathan Road, into which he moved with his then girlfriend, Cheryl Bordeleau.  *Id*. at 6-7, 13-14.  She lived there with him and their two children until either 2010 or 2014.  *Id*. at 13-14.[1]  Bordeleau worked as a hairdresser in town.  *Id*. at 14.

As it happens, Bordeleau was a one-time employee of Defendant Thomas Goulden, with whom she worked at a video rental store in Nashua in the 1980s.  Affidavit of Thomas Goulden ("Goulden Aff."), attached hereto as <u>Exhibit B</u>, ¶4.  Goulden, a former military police officer, moved on from the video store, working in loss prevention before starting a career in civil law enforcement with the Town of Brookline in 1994.  *Id*. ¶¶2-3, 5. He attended the New Hampshire Police Academy through Brookline and became Chief of Police there in May 1997.  *Id*. ¶6.  In May 2010 he left Brookline and joined the Hillsborough County Sherriff's Department, where he

---

[1]     He indicated that he split with Bordeleau when their youngest son was about a year old, which would suggest 2010 (his son is now 12).  Pl. Dep. 13.  He later testified that he was still seeing Bordeleau in 2014.  Pl. Dep. at 16-17.

worked until approximately August 2011.  *Id*. ¶7.  In September 2011 Goulden began working at the Pelham Police Department, where he was a fulltime officer until August 2014, when he took a position as Chief of Police in Shirley, Massachusetts.  *Id*. ¶12.  Although he stayed on the Pelham roster for a few months as a parttime officer, he resigned in January 2015.  He did not work in Pelham again after that.  *Id*. ¶13.  Like Plaintiff, Goulden had his hair cut from time to time by Bordeleau while in Pelham.  *Id*. ¶9.

At some point in the spring of 2014, Plaintiff became convinced that Goulden was having an affair with Bordeleau.  Pl's Dep at 16.  He took photos of the two talking while Goulden was on duty – he in a police cruiser and she in her SUV.  *Id*. at 18.  Plaintiff claims that he confronted Goulden, who he claims threatened to "turn [his life] inside out."  *Id*. at 20.  Thereafter, he claims, various Pelham officers followed him in out of town.  *Id*. at 25.  At one point, he asserts Goulden stopped him and required him to perform sobriety tests, during which Plaintiff claims Goulden repeatedly pushed him.  Complaint ¶76.

Goulden denies that he had any sexual relationship with Bordeleau but notes that he saw her in town from time to time and that Bordeleau occasionally sought his advice regarding various legal issues.  Goulden Aff. ¶11.  He denies making any threats against Plaintiff or orchestrating to have other officers follow him.  *Id*. ¶15.  He also denies ever stopping Plaintiff or administering sobriety tests to him, much less pushing him during any such test.  *Id*. ¶14.  As noted, Goulden left Pelham in 2014 to take a position with the Shirley Police Department.  *Id*. ¶12.  He did not work for Pelham again after that.  *Id*. at ¶13.

*Investigation into Reports of Animal Neglect*

In September 2016 Pelham police officer Allison Caprigno received a report of a dog – a rottweiler/pitbull mix - at large.  Affidavit of Allison Caprigno ("Caprigno Aff."), attached

3

hereto as <u>Exhibit C</u>, at ¶5. Caprigno was a part-time officer who had served as the Animal Control Officer since 2007. *Id.* ¶3. She attended the part time Police Academy and was familiar with the department's policies on arrests, including the requirement that arrests be made only upon a determination of probable cause. *Id.* ¶4.

The reporting party indicated that the dog at issue came from 31 Jonathon Road – Plaintiff's home. *Id.* ¶6. Caprigno responded to the address and met Plaintiff and Michelle Stone. *Id.* ¶7. Stone was as the time Plaintiff's girlfriend and had been living with him for about two years. Pl. Dep. at 29, 33. Both Stone and Plaintiff had been involved in rescuing dogs for some time and kept dogs at the home on short- and longer-term bases. Pl. Dep. at 30, 33. Plaintiff admits that at times he had as many as a dozen dogs at the house. Pl. Dep. at 32.

Plaintiff and Stone each denied having a dog matching the description of the dog at large. Caprigno Aff. ¶7. Caprigno, however, observed two other dogs at that property, one of whom had recently whelped and another in a chain link enclosure by the driveway. *Id.* ¶8. The latter appeared frail, and neither were registered with the Town. *Id.* ¶8. Plaintiff told Caprigno that he was just fostering the dogs, along with six others at the house (plus the puppies). *Id.* ¶9. Caprigno explained that even foster dogs were supposed to be registered. *Id.* ¶9.

On October 5, 2016, Caprigno heard from a Jody Harris from Looking Glass Animal Rescue in Connecticut. Caprigno Aff. ¶10. Harris expressed concerns about dogs she had placed in Plaintiff's care. *Id.* ¶10. The following day, Caprigno assisted fellow officer Ryan Donovan in responding to a complaint by Plaintiff against Stone. *Id.* ¶11. It seems Plaintiff had asked Stone to leave and find another place to live and that Stone did not want to leave. Pl. Dep. at 50-51. Stone did leave that evening. Pl. Dep. at 51-52. Plaintiff concedes that she was "very upset" and "angry" at the time. *Id.* at 51-52, 61. Not surprisingly, Plaintiff admits that between

the time he asked her to leave and the execution of the search warrant nearly two weeks later they were not talking.  Pl. Dep. at 61.

Stone met Caprigno the next morning (now October 7, 2016) at the station.  Caprigno Aff. ¶12.  She informed Caprigno that Plaintiff had numerous dogs at the home, identifying 35 by name and showing the officer photos of 20 to 30 dogs in crates, some of which were in the living room.  *Id*. ¶12.[2]  Caprigno observed that the dogs were underweight and seemed to lack food or water. *Id*. ¶12.  Other photos depicted dogs housed in the basement and garage.  *Id*. ¶13. Later that day Caprigno went to Plaintiff's home to assist a Looking Glass volunteer take possession of dogs that belonged to the rescue.  *Id*. ¶13.  She observed four pitbulls in crates in the basement and other dogs in the garage.  *Id*. ¶13.  Several of the crates had urine pools and fecal matter in them.  *Id*. ¶13.

Over the next few days Caprigno fielded calls from nearby animal control officers reporting that Plaintiff had left dogs with various persons in their respective towns.  Caprigno Aff. ¶14.  It appeared to Caprigno that Plaintiff was shuttling various dogs to other locations. *Id*. ¶14.  Several of the dogs were reported to be in poor condition.  *Id*. ¶14.  On October 10, 2016, Stone returned to the station and reported that she had been monitoring Plaintiff's movements on a "track my iPhone" app and believed he was moving dogs to Sudbury and Lincoln, Massachusetts.  *Id*. ¶15.  Plaintiff admits that during this time he was dispersing dogs to various locations, including Sudbury.  Pl. Dep. at 68, 72-74.

*Execution of Search Warrant*

Based on her observations and information from Stone, Harris, and her fellow animal control officers, on October 17, 2016, Caprigno applied for a search warrant for Plaintiff's home,

---

[2]     Plaintiff denies having so many dogs there but concedes that 35 dogs would be "absolutely" too many.  Pl. Dep. 88-89.

supported by a six-page affidavit.  Caprigno Aff. ¶17 and <u>Exhibit 1</u> thereto.  The application was presented to and approved by Circuit Court Judge Robert Stephen. *Id.*

The search warrant was executed the following day.  Caprigno Aff. ¶19.  Caprigno was present, along with numerous Pelham officers and ACO's from three other towns.  *Id.* ¶19.  Goulden was not present.  *Id.* ¶20.  Indeed, as a long-departed officer, Goulden had nothing to do with the decisions to investigate or arrest Plaintiff, nor did he enter into or elicit any agreement to harass Plaintiff.  Goulden Aff. ¶16; Caprigno Aff. ¶20.  Indeed, Caprigno notes that she had no communications with Goulden since he left the department.  *Id.* ¶20.  Sergeant Matthew Keenliside, although still employed at the department, likewise did not direct the investigation, execution of the warrant, arrest or prosecution of Plaintiff.  Affidavit of Matthew Keenliside ("Keenliside Aff."), attached hereto as <u>Exhibit D</u>, at ¶7.[3]  Plaintiff was also not present during the search.  Pl. Dep. p. 76.

> Caprigno recalls her observations in the home as follows:
>
> Upon entering the home there was a very strong smell of ammonia.  There were two dogs in crates in the kitchen with a small amount of water and no food.  There was another dog inside the first-floor bathroom laying on a dirty blanket.  The walls had dirty claw marks on them, and it appeared a dog had chewed a hole in the door.  The living room had piles of feces on the floor and the carpets were stained with urine.  Upstairs there were more urine stains and there was fecal matter in the doorway of the front office.  Eight puppies were in one bedroom on a soiled towel.  There were three empty cooking pans on the floor with no water in them.  There were dogs in the basement with soiled newspaper in their crates.

Caprigno Aff. ¶21.  Numerous photos of the home and dogs there were taken, copies of several of which are attached hereto.  *See* Caprigno Affidavit <u>Exhibit 2</u>.  They removed 10 adult dogs and the eight puppies.  *Id.* ¶23.  Several of the dogs were underweight, others had hookworm and

---

[3]     Like Goulden, Keenliside was a military veteran, having served in the Army National Guard from 2004 to 2013, including as a helicopter pilot.  Keenliside Aff. ¶2.  Now a Sergeant in the Department, he is familiar with the Department's SOPs, which include requirements that arrests be made only upon probable cause.  *Id.* ¶5.

Giardia, and yet others urine and fecal scalding on their feet.  *Id.* ¶23.

*Arrest and Disposition*

Based on her observations, Caprigno charged Plaintiff with ten counts of neglect, a misdemeanor under RSA 644:8.  She sought an arrest warrant for Plaintiff, again supported by an affidavit and submitted to a Justice of the Peace for review.  *Id.* ¶25 and Exhibit 3 thereto. The Justice of the Peace expressly found probable cause, Caprigno Ex. 3 p.7, and an arrest warrant issued on October 26, 2016, pursuant to which Plaintiff was arrested.  *Id.* ¶26 and Exhibit 4.

Plaintiff's prosecution was originally handled by police prosecutor Michael McCall. Caprigno Aff. ¶27.  During the course of the prosecution arrangements were reached regarding the disposition of the various dogs, some of which were returned to shelters or rescues and some directly back to Plaintiff.  *Id.* ¶28.  Plaintiff took responsibility for certain veterinary and/or boarding bills which he paid at the police station.  *Id.* ¶28.  On one such occasion, he contends that Officer Matthew Keenliside "chest bumped" him.  Pl. Dep. 91.  Officer Keenliside – a nine-year Army National Guard veteran - denies doing so.  Keenliside Aff. ¶9.[4]  Caprigno, whom Plaintiff claims was present during the encounter, likewise denies any contact between the men. Caprigno Aff. ¶29.  Ultimately, Mr. McCall left Pelham's employment and the new prosecutor, Brendan Carroll, nolle prossed the charges in May 2017 over concerns about the cost of experts Affidavit of Brendan Carroll attached hereto as Exhibit E, ¶5.

Plaintiff's arrest and prosecution garnered a certain amount of media attention, as do many cases involving animal cruelty. Plaintiff indicates that there are 17 such articles, all of

---

[4]    The lobby area in which this is alleged to have occurred is under video surveillance. Keenliside Aff. ¶10.  Had any such allegation been timely raised, the Department would have had an opportunity to disprove it through review of the video.  *Id.*  The same is true of care stops such as that allegedly performed by Goulden.  *Id.*

which stemmed from his arrest.  Pl. Dep. at 98.  He says the articles portrayed him as a dog hoarder or dog abuser.  *Id*.  In his Complaint he did not identify any specific statements by the Pelham Defendants that he claimed to be defamatory except an alleged statement by Caprigno that he was "an evil little man" who needed counseling and "was not right in the head." Complaint ¶40.  He claims that Caprigno also informed him the two of the dogs had been euthanized.  *Id*.  Caprigno denies the statements.  Caprigno Aff. ¶31.  She also denies instructing Stone to track Plaintiff's movements.  *Id.* ¶16.

## STANDARD OF REVIEW

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).  Summary judgment motions provide courts the opportunity to "pierce the boilerplate of the pleadings and assay the parties' proof in order to determine whether trial is actually required."  *Acosta v. Ames Dept. Stores, Inc*., 386 F.3d 5, 7 (1st Cir. 2004) (quoting *Wynne v. Tufts Univ. Sch. of Med*., 976 F.2d 791, 794 (1st Cir. 1992)).  Thus, although the initial burden is upon the moving party to establish the lack of a genuine, material, factual issue, *Finn v. Consolidated Rail Corp*., 782 F.2d 13, 15 (1st Cir. 1986), and the court must view the record in the light most favorable to the non-movant, *Oliver v. Digital Equipment Corp.*, 846 F.2d 103, 105 (1st Cir. 1988), if a motion for summary judgment is properly supported, the burden shifts to the non-movant to show that a genuine issue exists.  *Donovan v. Agnew*, 712 F.2d 1509, 1516 (1st Cir. 1983).

Additionally, pursuant to Federal Rule of Procedure Rule 8(a), the Court may also dismiss claims for relief which fail to set forth "a short and plain statement of the claims showing

that the pleader is entitled to relief."  Fed. R. Civ. P. Rule 8(a)(2); *see also Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007) ("[A] plaintiff's obligation … requires more than labels and conclusions, and a formulaic recitation of a cause of action's elements will not do.").  A claim cannot survive "if it tenders naked assertions devoid of further factual enhancement." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 557 (quotation marks and brackets omitted)).

## ARGUMENT

Plaintiff has alleged two federal claims against Goulden, Caprigno and the Town of Pelham.  Count I appears to be a Substantive Due Process claim, although he also references wrongful arrest and false imprisonment.  Count II is a Conspiracy claim brought pursuant to 42 U.S.C. §1985.  The undisputed facts, however, establish that there was probable cause to arrest and prosecute Plaintiff and Defendants deny they entered into any agreement to harass him or otherwise violate he rights, which were not violated in any event.  Plaintiff's state law claims likewise largely rest on the assertion that probable cause was lacking, an assertion overwhelmingly disproven by the facts of the case.  At minimum, each of the Defendants would be entitled to immunity from the federal and state claims.

## I.   THE PLAINTIFF CANNOT ESTABLISH THAT THE DEFENDANTS VIOLATED HIS FEDERAL CONSTITUTIONAL RIGHTS.

By Counts I and II of the Complaint, the Plaintiff asserts claims pursuant to 42 U.S.C. §§ 1983 and 1985.  The undisputed facts, however, demonstrate that the Plaintiff cannot sustain his burden of proof on any of these claims.

### A.  Defendants Are Entitled to Summary Judgment on Count I because there was Probable Cause to Arrest and Prosecute him.

Although not perfectly clear, Count I appears to assert a Substantive Due Process claim. *See* Complaint ¶¶ 46, 53 (citing Fourteenth Amendment).  However, it rests largely on claims

that his arrest was improper.  Complaint ¶¶ 48-50.  Such claims are more properly analyzed under Fourth Amendment rather than under the Fourteenth Amendment.  *See Baker v. McCollan*, 443 U.S. 137, 142-43 (1979) (citing *Gerstein v. Pugh*, 420 U.S. 103 (1975)) (Court need not to engage in a separate or different analysis for a claim under the Fourteenth Amendment after finding probable cause nullifying any claim of violation of the Fourth Amendment).  Here, the facts easily demonstrate that there was probable cause to arrest Plaintiff for neglect.

"Probable cause to arrest exists if, at the moment of the arrest, the facts and circumstances within the relevant actors' knowledge and of which they had reasonably reliable information were adequate to warrant a prudent person in believing that the object of his suspicions had perpetrated or was poised to perpetrate an offense."  *Roche v. John Hancock Mutual Life Ins. Co.*, 81 F.3d 249, 254 (1st Cir. 1996).  *Accord*, *Rivera v. Murphy*, 979 F.2d 259, 263 (1st Cir. 1992) (quoting *United States v. Figueroa*, 818 F.2d 1020, 1023 (1st Cir. 1987)).  In circumstances involving a warrant, the affidavit supporting the warrant must present sufficient facts and circumstances to demonstrate a substantial likelihood that the crime alleged was committed.  *Cf. State v. Schulz*, 164 N.H. 217, 221 (2012) (stating requirements of affidavit for search warrant).

Whether probable cause exists on undisputed facts is a question of law for the court. *Acosta v. Ames Dept. Stores, Inc.,* 386 F.3d 5, 8-9 (1st Cir. 2004) (citations omitted).  Courts view the elements of evidence of probable cause in the totality of the circumstances and "from the arresting officer's point of view at the time the arrest was made."  *State v. Vandeboagart*, 139 N.H. 145, 164 (1994); *see also, e.g.*, *United Sates v. McElroy*, 587 F.3d 73, 78 (1st Cir. 2009) (stating that probable cause "determination is based on the totality of the circumstances"); *Rivera*, 979 F.2d at 263.  Moreover, "[c]ourts are not bound by mathematical calculations in

making [a probable cause] determination, but rather must approach the issue with a concern for the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act." *Id*. at 163.  To this end, a finding of probable cause "does not require the officer's conclusion to be ironclad, or even highly probable.  Their conclusion that probable cause exists need only be reasonable."  *Acosta*, 386 F.3d at 11 (quoting *United States v. Winchenbach*, 197 F.3d 548, 555-56 (1st Cir. 1999)).  Probable cause requires only a "fair probability" that the defendant committed the crime.  *See, e.g., Illinois v. Gates*, 462 U.S. 213 (1983); *United States v. Garcia*, 179 F.3d 265, 269 (5th Cir. 1999); *United States v. Antone*, 753 F.3d 1301, 1304 (5th Cir. 1985) ("A 'fair probability' does not mean that a reasonable official would have thought it were more likely than not that the defendant committed a [crime].").  Once an officer "accumulates facts that demonstrate sufficient probable cause," he or she may terminate the investigation; they are not required to investigate further or explore potential defenses before reaching a decision on probable cause.  *Acosta*, 386 F.3d at 11 ("Probable cause determinations are, virtually by definition, preliminary and tentative").

> RSA 644:8 (III) provides that person is guilty of a misdemeanor if he or she:
>
> (a) Without lawful authority negligently deprives or causes to be deprived any animal in his possession or custody necessary care, sustenance or shelter; [or]
>
> (h) Otherwise negligently permits or causes any animal in his or her possession or custody to be subjected to cruelty, inhumane treatment, or unnecessary suffering of any kind.

RSA 644(III).  The statute is considered a "results oriented" statute, meaning that the outcome drives the charge.  *See State v. Anthony*, 2003-0729 (N.H. Aug. 11, 2004)

Here, there was ample evidence from which to believe Plaintiff had violated the statute. At the outset, Stone provided a statement detailing the sheer number of dogs then at Plaintiff's home – number Plaintiff agreed would be "absolutely" too many.  Caprigno was entitled to rely

upon her statement to establish probable cause, particularly where – as here – she had an opportunity to assess her credibility.  *Cf. United States v. Belton*, 414 F.Supp.2d 101, 112 (D.N.H. 2006) ("[T]he ultimate issue is whether the totality of the circumstances establishes the credibility of the informant's story.")  Here, however, Stone backed those statements up with photos she showed the officer.  More importantly, upon executing the warrant, Caprigno was able to confirm the conditions the dogs then present were subjected to, including their lack of water, the urine pools and stains, and the feces present throughout the house, and apparent malnourishment.  The photos attached to Caprigno's summary judgment affidavit alone establish probable cause, particularly bearing in mind that the offense only requires negligent conduct. *See State v. Anthony*, 2003-0729 (N.H. Aug. 11, 2004).  *See also* RSA 626:2 (criminal negligence requires conduct that is in gross deviation from conduct that a reasonable person would observe and thereby creates a substantial and unjustifiable risk).  Moreover, Caprigno did not arrest Plaintiff on the spot, but sought an arrest warrant, presenting an affidavit recounting the facts to a Justice of the Peace who expressly found probable cause existed.  *See Gerstein v. Pugh*, 420 U.S. 103, 113-14 (1975) (stating that that "maximum protection of individual rights" is assured when an independent magistrate reviews the factual justification prior to any arrest). Given the approval of the warrant, probable cause is established.

To the extent that Plaintiff pursues an independent Fourteenth Amendment claim, his burden of proof is significantly higher and even further out of his reach.  As summarized by this court in *Foley v. Lee*:

> A substantive due process claim requires proof both that the defendants deprived the plaintiffs of a protected interest in life, liberty, or property, *see* U.S. Const. Am. XIV, cl. 1, and that the defendants' actions in doing so "shock the conscience."  *See, e.g., Harron v. Town of Franklin*, 660 F.3d 531, 536 (1st Cir. 2011); *Est. of Bennett v. Wainwright*, 548 F.3d 155, 162 (1st Cir. 2008). To be conscience-shocking, a defendant's actions "must be truly outrageous, uncivilized,

and intolerable . . . and the requisite arbitrariness and caprice must be stunning, evidencing more than humdrum legal error." *Harron*, 660 F.3d at 536.

*Foley v. Lee*, 2012 DNH 081.  "An action that 'shocks the conscience' typically manifests 'an extreme lack of proportionality, as the test is primarily concerned with violations of personal rights so severe, so disproportionate to the need presented, and so inspired by malice or sadism rather than a merely careless or unwise excess of zeal that it amounted to a brutal and inhumane abuse of official power.'  *Id*. (quoting *Harron*, 660 F.3d. at 536).  Even an unreasonable use of force does not automatically meet this high standard.  *S.R. Nehad v. Browder*, 929 F.3d 1125, 1139 (9th Cir. 2019) *(*"Although '[o]bjective reasonableness is one means of assessing whether' conduct meets the 'shocks the conscience' standard, an unreasonable use of force does not necessarily constitute a Fourteenth Amendment substantive due process violation") (quoting *Brittain v. Hansen*, 451 F.3d 982, 991 n.1 (9th Cir. 2006)) (further citation omitted).

The First Circuit catalogued the type of conduct that meets this high burden:

> Among the cases in which plaintiffs have prevailed are those involving a student blinded in one eye when a coach intentionally struck him in the head with a metal weight; a teacher's fabrication of sexual abuse charges against a father, resulting in loss of contact with his child for three years; rape by a police officer in connection with a car stop; a 57–day unlawful detention in the face of repeated requests for release; police officers aiding a third-party in shooting the plaintiff; an intentional assault by a police officer who struck a pretrial detainee twice in the head and threatened to kill him; and a principal forcing his way into a room where a student was hiding, grabbing her from the floor, throwing her against the wall, and slapping her.

*Cummings v. McIntire*, 271 F.3d 341, 346 (1st Cir. 2001) (footnote and citations omitted).  There is simply nothing alleged (much less established) in this case that would support a finding that Defendants' behavior was "conscious-shocking."

Finally, even if probable cause to arrest the Plaintiff was deemed lacking, the officers would be entitled to qualified immunity.  Qualified immunity protects government officials who are performing discretionary functions from liability and the burdens of litigation.  *See Harlow v.*

*Fitzgerald*, 457 U.S. 800, 818 (1982).   "[G]overnment officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."   *Id*.

> A state actor may be entitled to qualified immunity for rights-violating conduct as long as he had an objectively reasonable basis for believing that his conduct would not abridge the rights of others.   This means, of course, that the reasonableness standards underlying the probable cause and qualified immunity inquiries are not coterminous.

*Iacobucci v. Boulter*, 193 F.3d 14, 23 (1st Cir. 1999) (citations omitted) (citing *Camilo-Robles v. Zapata*, 175 F.3d 41, 43 (1st Cir. 1999); *Quintero de Quintero v. Aponte-Roque*, 974 F.2d 226, 228 (1st Cir. 1992)).

In a probable cause case, police officers are entitled to qualified immunity if "a reasonable officer could have believed that probable cause existed to arrest." *Rivera v. Murphy*, 979 F.2d 259, 263 (1st Cir. 1992) (citing *Harlow*, 457 U.S. at 818).   As the First Circuit observed in *Rivera*, "[t]his is not a stringent test."   *Id*.   "Indeed, the qualified immunity standard gives ample room for mistaken judgments by protecting all but the plainly incompetent or those who knowingly violate the law."   *Id.*   (quoting *Hunter v. Bryant*, 502 U.S. 224 (1991) (internal quotations and brackets omitted)).   *Accord Rivera Rodriguez v. Beninato*, 469 F.3d 1, 3-4 (1st Cir. 2006).   Therefore, the Defendant officers are entitled to qualified immunity "so long as the presence of probable cause is at least arguable."   *Rivera*, 979 F.2d at 263 (quoting *Ricci v. Urso*, 974 F.2d 5, 7 (1st Cir. 1992)) (further citations omitted).   Here, any officer could (and would) reasonably believe that probable cause existed – just as the Justice of the Peace reviewing the matter found.   In short, even if the Justice was mistaken, her judgment demonstrates that a reasonable officer could also believe Caprigno had probable cause to arrest Plaintiff.

### B. Defendants Are Entitled to Summary Judgment on Count II because there was no Agreement to Harass Plaintiff and no Underlying Violation of his Rights.

"The elements of a section 1985 claim are straightforward: (1) a conspiracy; (2) a conspiratorial purpose to deprive the plaintiff of the equal protection of the laws; (3) an overt act in furtherance of the conspiracy; and, lastly (4) either (a) an injury to person or property or (b) a deprivation of a constitutionally protected right." *Soto–Padró v. Pub. Buildings Auth.*, 675 F.3d 1 (1st Cir. 2012) (quoting *Pérez–Sánchez v. Pub. Bldg. Auth.,* 531 F.3d 104, 107 (1st Cir.2008) (internal quotations omitted). Such a claim also "requires 'some racial, or perhaps otherwise class-based, invidiously discriminatory animus behind the conspirators' action." *Id.* (quoting *Pérez–Sánchez*, 531 F.3d at 107) (itself quoting *Griffin v. Breckenridge*, 403 U.S. 88, 102 (1971)).

Here, Plaintiff cannot establish an actual conspiracy – that is, an agreement of "two or more persons acting in concert to . . . inflict a wrong against or injury upon another." *Estate of Bennett v. Wainwright*, 548 F.3d 155, 178 (1st Cir. 2008) (internal quotation marks and citation omitted). Goulden and Caprigno deny any such agreement and given the differential in time between the alleged threat by Goulden to take action against him and Plaintiff's actual arrest some two years later – long after Goulden had left the department – no such agreement can be inferred. Moreover, Plaintiff has not established an underlying violation of his rights. Such failure is also fatal to his claim. *See Bane v. Registry of Motor Vehicles*, 72 F.3d 121 (1st Cir. 1995) (ancillary §1985 conspiracy claim necessarily where underlying claim not established) (citations omitted). Finally, he has not asserted any facts from which any racial or otherwise class-based animus informed the alleged conspirators' actions. Under these circumstances, the Conspiracy claim must fail.

### C.  Plaintiff does not have a viable *Monell* claim against the Town.

"It is by now axiomatic that the doctrine of *respondeat superior* does not apply to claims under section 1983." *Gaudreault v Salem, Mass.*, 923 F.2d 203, 209 (1st Cir. 1990) (citing *Voutour v. Vitale*, 761 F.2d 812, 819 (1st Cir. 1985)).  A municipality or its supervisory personnel can be held liable for the constitutional misconduct of its employees **only** on the basis of an "affirmative link" between their acts and those of the offending employee. *Id.*  In order to establish municipal liability, the Plaintiff must do more than merely establish the Town was somehow negligent in its training or supervision of the officer but must show that the acts or omissions of the municipality's policymakers' evidence "deliberate indifference" to the rights of its inhabitants. *Id.* (citing *Canton v. Harris*, 489 U.S. 378, 387-90 (1989)).  Supervisors similarly can be held liable only on the basis of their own acts or omissions, amounting at the least to "reckless" or "callous" indifference to the constitutional rights of others.  *Id.* (citing *Gutierrez-Rodriguez v. Cartagena*, 882 F.2d 553, 562 (1st Cir. 1989)).

More particularly, the Plaintiff must establish that:

(1) a municipal policymaker intentionally adopted a policy, implemented a training protocol, or allowed a custom to develop; (2) the challenged policy, training protocol, or custom caused a violation of federally protected rights; and (3) the policymaker acted with at least deliberate indifference to the strong likelihood that a violation of federally protected rights will result from the implementation of the policy, training, protocol, or custom.

*Penney v. Town of Middleton*, 888 F. Supp. 332, 340 (D.N.H. 1994); *accord Canton*, 489 U.S. at 385-92.  "[M]unicipal liability under § 1983 attaches where – and only where – a deliberate choice to follow a course of action is made from among various alternatives by the official or officials responsible for establishing final policy with respect to the subject matter in question." *Pembaur*, 475 U.S. at 483.  This is true even if a plaintiff establishes that an officer violated his rights.  *See Oklahoma City v. Tuttle*, 471 U.S. 808, 823-24 (1985) (proof of a single incident of

16

unconstitutional activity insufficient to impose liability on town without proof that it was caused by municipal policy).  Equally important, "[w]ithout a finding of a constitutional violation on the part of a municipal employee, there cannot be a finding of section 1983 damages liability on the part of the municipality."  *Wilson v. Town of Mendon*, 294 F.3d 1, 7 (1st Cir. 2002) (emphasis added).

As Plaintiff has not proven that his rights were violated, the Town is entitled to summary judgment as a matter of law on the derivative claims under 42 U.S.C. § 1983.  *See City of Los Angeles v. Heller*, 475 U.S. 796 (1986).  To the extent that the Plaintiff's claim against any individual Defendant survives, however, Plaintiff cannot present any facts to show that the Town has any policy or practice that create the likelihood of such a violation. To the contrary, the evidence shows that Caprigno had been an officer for nearly 10 years, had attended the part time Police Academy, and acted cautiously by seeking a search warrant and then an arrest warrant The department has policies and procedures for investigating crimes and arrests and requires probable cause to make an arrest.  *See*, Caprigno Aff. ¶4; Keenliside Aff. ¶5.  Thus, far from having a policy or practice that is deliberately indifferent to a strong likelihood that the Plaintiff's rights would be violated, the Town has policies, procedures and training which properly guide officers in investigating a crime and making an arrest.  As such, any federal claim against the Town must be dismissed.

## II.   DEFENDANTS ARE ENTITLED TO SUMMARY JUDGMENT ON THE PARALLEL STATE CLAIMS.

Although this Court frequently declines to exercise supplemental jurisdiction over state claims, here the same grounds that require the entry of summary judgment for the Defendants on the federal counts – the existence of probable cause and the absence of other constitutional violations – apply equally to bar the majority of the state claims.  Judicial economy thus suggests

that the Court continue its analysis even after resolving the federal claims, particularly given the post Covid crush on pending cases in the state courts.

Of note, the Town itself cannot be held liable on any of the state claims.  *See* RSA 507-B:2 (a governmental unit can be held liable in actions for bodily injury or personal injury only "arising out of ownership, occupation, maintenance or operation of motor vehicles or premises"). "Personal injury" actions expressly include defamation.  Moreover, an individual officer can only be held liable for such tort claims if Plaintiff establishes that the officer charged did not act in good faith.  *See* RSA 507-B:4 (claims against individual governmental employees subject to same restrictions as municipality where acting in scope of office and in good faith).

In addition, pursuant to the doctrine of official immunity, an officer is only liable under state law for discretionary actions made the course of employment that are <u>wanton</u> and <u>willful</u>. *Everitt v. General Elect. Co.*, 156 N.H. 202, 219, 221 (2007).  Official immunity exists "to protect public officials from the fear of personal liability, which might deter independent action and impair effective performance of their duties."  *Id.* at 215.  As the court in *Everitt* noted, "[p]olice officers are trusted with one of the most basic and necessary functions in civilized society, securing and preserving public safety."  *Id.* at 217.  In carrying out this duty, "[p]olice officers are regularly called upon to utilize judgment and discretion . . . ."  *Id.*  "The public simply cannot afford for those individuals charged with securing and preserving community safety to have their judgment shaded out of fear of subsequent lawsuits or to have their energies otherwise deflected by litigation, at times a lengthy and cumbersome process."  *Id.* at 218.

As such, police officers - and through them their employers - are entitled to official immunity for "decisions, acts or omissions that are: (1) made within the scope of their official duties while in the course of their employment; (2) discretionary; rather than ministerial; and (3)

not made in a wanton or reckless manner." *Id.* "A discretionary decision, act or omission involves the exercise of personal deliberation and individual professional judgment that necessarily reflects the facts of the situation and the professional goal." *Id.* This includes decisions "for which there are no hard and fast rules as to the course of conduct that one must or must not take and those acts requiring the exercise of judgment and choice and involving what is just and proper under the circumstances." *Id.* at 219-20. Official immunity "shields against lawsuits alleging common law torts, such as negligence." *Id.* at 209.

Applying those standards, it is readily apparent that Plaintiff cannot satisfy his burden of proof on any state tort claim.

### A. Defendants are entitled to Summary Judgment on Count III because Plaintiff cannot Establish a Conspiracy.

As set forth above, Plaintiff cannot establish any actual conspiracy to deprive him of any rights or otherwise cause him harm, which has been expressly denied by Defendants. Moreover, the only action allegedly occurring in furtherance of any conspiracy within the three-year statute of limitations period is Plaintiff's October 2016 arrest, the instant Complaint having been filed on October 2, 2019. Plaintiff's arrest, as set forth above, was lawful and therefore cannot support a conspiracy claim under state law.

### B. The Existence of Probable Cause Entitles Defendants to Summary Judgment on Counts IV, VI and VII of the Complaint.

By Counts IV, VI and VII, Plaintiff asserts claims for False Imprisonment, Malicious Prosecution, and Abuse of Process against various Defendants. Each such claim is defeated by the presence of probable cause. *See Hickox v. J.B. Morin Agency, Inc.*, 110 N.H. 438, 442 (1970) (false imprisonment is <u>unlawful</u> restraint on movement); *Robinson v. Fimbel Door Co.*, 113 N.H. 348, 350 (1973) ("To prevail upon a claim of malicious prosecution, a plaintiff must prove that [s]he was subjected to a criminal prosecution instituted by the defendant <u>without</u>

probable cause and with malice, and that the criminal proceeding terminated in [her] favor.")
(emphasis added)' *Long v. Long*, 136 N.H. 25, 29 (1992) (Abuse of Process claims require proof
of some improper use of process to accomplish a purpose for what it is not designed).  To the
extent Plaintiff relies on various alleged traffic stops as grounds for his false imprisonment
claims, he has not asserted that any specific Defendant was directly involved in such stops.  *See*
Complaint ¶21.

### C. Defendants are entitled to Summary Judgment on Count V because Plaintiff cannot Establish an Assault and Battery.

Defendant Goulden denies stopping Plaintiff or having him conduct sobriety tests, much
less pushing the Plaintiff during such tests.  In any event, however, any such actions would be
barred by the statute of limitations.  Goulden left the Pelham Police Department on January 1,
2015.  This suit was not brought until October 2, 2019 – over three years after Goulden left the
force.  As such, any claims based on stops he made while an officer there are time barred.  See
RSA 508:4.

Although not time barred, the claim against Keenliside should also be dismissed.
Keenliside denies chest bumping Plaintiff in the station, as does Caprigno, who allegedly was
present during the encounter.  Had the event occurred (and been reported), it would have been
recorded on video, or at minimum the officer would have had an opportunity to submit additional
evidence that it did not occur.  In any case, Plaintiff has not asserted that he suffered an injury as
a result of the conduct and no damages are readily apparent.

### D. Defendants are entitled to Summary Judgment on Count VIII because Plaintiff cannot Establish Extreme and Outrageous Conduct.

A claim of intentional infliction of emotional distress requires that the Plaintiff prove that
the officers: (1) acted intentionally or recklessly; (2) that their acts were extreme and outrageous;
and (3) that their acts caused the plaintiffs to suffer severe emotional distress.  *Morancy v.*

*Morancy*, 134 N.H. 493 (1991); *see also Konefal v. Hollis/Brookline Coop. Sch. Dist.*, 143 N.H. 256, 260 (1998) (citation omitted) (stating that "[o]ne who by extreme and outrageous conduct intentionally causes severe emotional distress to another is subject to liability for that emotional distress.").  To meet the "extreme and outrageous" element of this claim, the Plaintiff must show that the Individual Defendants' "conduct exceeded all possible bounds of decency."  N.H. CIVIL JURY INSTRUCTION 9.8.  The state supreme court has further detailed this burden as follows:

> In determining whether conduct is extreme and outrageous, it is not enough that a person has "acted with an intent which is tortious or even criminal, or that he has intended to inflict emotional distress, or even that his conduct has been characterized by 'malice.'" *Restatement (Second) of Torts* § 46 comment *d* at 73 (1965). Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.

*Mikell v. Sch. Admin. Unit No. 33,* 158 N.H. 723, 729 (2009) (some quotations and citations omitted); *see also Konefal*, 143 N.H. at 261 (noting that "outrageous conduct" contemplates "a great deal more" than simply "illegal and reprehensible conduct").  Whether conduct rises to the level of "extreme and outrageous" can be determined by the court as a matter of law.  *See, e.g., Konefal*, 143 N.H. at 260-61 (upholding trial court's dismissal of intentional infliction of emotional distress claim for failing to meet "extreme and outrageous" standard).

Based on the undisputed facts the Plaintiff cannot demonstrate that the Defendants acted in an "extreme and outrageous" manner.  Goulden's alleged threats – even taken as true and not time-barred – fall far short of that in *Konefal*, which itself was insufficient, and Caprigno's arrest of Plaintiff was supported by probable cause.  Nothing in the actions of the Defendants rises to the level of "extreme and outrageous."  Therefore, the Plaintiffs' infliction of emotional distress claim fails as a matter of law.

### E.   Defendant Caprigno is entitled to Summary Judgment on Plaintiff's Defamation Claims (Counts IX and X).

Plaintiff brought two defamation claims (Defamation and Defamation Per Se) against various defendants, only one of whom – Caprigno – remains in the case.  The sole statements he attributes to her, however, are that she allegedly said that he was "an evil little man" who "needed counseling and was not right in the head."  Such statements are clearly statements of opinion that are not actionable.  *See Automated Transactions LLC v. American Bankers Assn.*, 216 A.3d 71 (2019) and case cited therein.  To the extent that Plaintiff would add to his claim publication of his arrest, the claim still fails: The police may legitimately release details of their investigation.  *See Thomas v. Telegraph Publishing Co.,* 155 N.H. 314, 342 (2007) (police may publish statements regarding their investigations if done for valid purpose with reasonable belief in truth).

### F.   Defendants Caprigno and the Town are entitled to Summary Judgment on Count XI (Invasion of Privacy).

Plaintiff's invasion of privacy claim is based solely on the assertion that Caprigno forced Stone to install a tracking device in Rocheville's cell phone.  Complaint ¶¶ 106-07.  This simply did not happen.  *See* Caprigno Aff. ¶15.  Indeed, Plaintiff admits that after kicking Stone out of the house on October 6, 2016, he did not see her again until after the search warrant was executed.  As such, Stone would not even have had the opportunity to install such a device on his phone.

### CONCLUSION

Plaintiff was arrested based on an investigation that led to a search of his home and the discovery therein of multiple dogs in deplorable conditions.  It may well be that Plaintiff simply got himself overextended despite his best intents to care for a large number of rescue animals.  The result, however, was that the dogs were suffering from a variety of ailments and living in

inhumane and unclean conditions.   As there was probable cause to charge him with animal cruelty under RSA 644:8, and because there is no evidence the charges were the result of any conspiracy, Defendants should be granted judgment on all federal claims and the parallel state claims.

Respectfully submitted,

**THOMAS GOULDEN,**
**MATTHEW KEENLISIDE,**
**ALLISON CAPRIGNO and**
**TOWN OF PELHAM**

By their Attorneys,

**CULLENCOLLIMORE, PLLC**

Dated:  July 21, 2021                    By: /s/ Brian J.S. Cullen
                                                    Brian J. S. Cullen, NH Bar # 11265
                                                    10 East Pearl Street
                                                    Nashua, NH  03060
                                                    (603) 881-5500
                                                    bcullen@cullencollimore.com

### <u>CERTIFICATE OF SERVICE</u>

I certify that a copy of this filing was served via the Court's ECF filing system upon counsel of record.

Dated:  July 21, 2021                         /s/ Brian J.S. Cullen
                                                         Brian J.S. Cullen