UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF NEW HAMPSHIRE

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*
                                                                       \*

KEVIN ROCHEVILLE    \*

     V.    \*

THOMAS GOULDEN, MATTHEW KEENLISIDE, BRIAN    \*

MCCARTHY, JOSEPH O'ROARK, MICHAEL MCCALL,    \*

ALLISON CAPRIGNO, JODY HARRIS-STERN, JOHN DOES,    \*

JANE DOES, AND TOWN OF PELHAM, NH    \*

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

Docket No. 19-CV-00169-AJ

<u>DEPOSITION OF KEVIN ROCHEVILLE</u>

Deposition taken at the LAW OFFICES OF CULLENCOLLIMORE, P.L.L.C., 10 E. Pearl Street, Nashua, New Hampshire, on Thursday, June 17, 2021, commencing at 9:23 p.m.

Page 5

1  having you state your name and your address.
2      A.  Kevin R. Rocheville.  31 Jonathan Road,
3  Pelham, New Hampshire.
4      Q.  Okay.  And I know your attorney has
5  probably gone through some of the basic ground rules
6  for the deposition.  And I know you have had a
7  deposition before, but just mostly for the
8  stenographer's sake there are a couple of really
9  important ones.  One, is just make sure your answers
10 stay -- keep your voice up.  And if you can answer
11 out loud.  If you shake or nod, either your lawyer
12 or I will just prompt you to give us an oral
13 response.  Okay.
14     A.  Yes, Sir.
15     Q.  And if you don't understand a question that
16 I ask you, just let me know.  And I will rephrase it
17 as best I can, okay.
18     A.  Yes, Sir.
19     Q.  Okay.  And as you're already doing if you
20 can just let me finish my question before you
21 answer, that's great.  And if you -- and I'll try to
22 do you the same courtesy.  There are going to be
23 times when you know in advance what I'm going to ask

Page 6

1  you, and the inclination is to sort of jump in and
2  answer, but it's hard for Kim to type down both of
3  us at the same time, okay.
4      A.  Yes, Sir.
5      Q.  Okay.  If you need to take breaks at any
6  time you don't have to tell me why.  Just say you
7  want to take a break.  And we'll take one, okay.
8      A.  Yes, Sir.
9      Q.  How are you feeling today?
10     A.  Good, Sir.
11     Q.  Are you on any medications or anything?
12     A.  No, Sir.
13     Q.  Tell me a little bit about yourself,
14 Mr. Rocheville.  How old are you today?
15     A.  55 years old.
16     Q.  And where did you grow up?
17     A.  Tyngsborough, Mass.
18     Q.  How long have you been at 31 Jonathan Road?
19     A.  Since 220.
20     Q.  When you say, "220," 2020?
21     A.  Yes, Sir.
22     Q.  So just a year ago?
23     A.  No.  The house was built in the year -- the

Page 7

1  house is 20 years old.
2      Q.  Okay.  Do you mean, maybe, 2001, then?
3      A.  Yeah.  The year 2000 the house was built.
4      Q.  Okay.  And you moved into it in 2001?
5      A.  Yes, Sir.
6      Q.  Okay.  I thought I heard you say, "220."
7  And I wasn't sure if you meant last year, 2020.  Are
8  you presently married?
9      A.  No.
10     Q.  Did you go to high school down in
11 Tyngsborough, in that area?
12     A.  Yes.
13     Q.  Okay.  And did you graduate high school?
14     A.  Yes.
15     Q.  And what did you -- what year was that?
16     A.  1983.
17     Q.  After high school did you go onto any other
18 education or certifications?
19     A.  I did some college at University of Lowell.
20     Q.  Okay.  Did you complete a course there or a
21 degree?
22     A.  I did not.
23     Q.  Okay.  What's your current occupation?

Page 8

1      A.  Heavy equipment mechanic.
2      Q.  Okay.  And did you receive some sort of
3  training or certificate to do that?
4      A.  Yes.
5      Q.  And where did you perform that?
6      A.  I worked for different dealerships;
7  Manchester Mack.  I worked for Paul Products in
8  Wakefield, Mass.  Cummins Northeast.  Various
9  dealerships.
10     Q.  Okay.  And that's where you got your
11 experience in working for -- on heavy equipment?
12     A.  Yes.
13     Q.  Okay.  And I apologize.  Where are you
14 currently employed?
15     A.  I'm self-employed.
16     Q.  And what is it that you do?
17     A.  Repair equipment on-site.
18     Q.  How long have you been doing that
19 self-employed?
20     A.  Last five years.
21     Q.  At the time in October of 2016 when the
22 search warrant was executed at your house at 31
23 Jonathan Road where were you working then?

Page 13

1   A.  It's been a couple of years.
2   Q.  And how long -- did you ever live with Ms.
3   Bordeleau?
4   A.  Yes.
5   Q.  When was that?
6   A.  17 years total time.
7   Q.  And what was the end of that?  What date
8   did that end?
9   A.  I don't remember the approximate dates.
10  Q.  Okay.  Relative to 2016 -- well, let me,
11  actually, say this differently.  You said your
12  younger son's name is Grayson?
13  A.  Yes, Sir.
14  Q.  And he's approximately 12?
15  A.  Yes, Sir.
16  Q.  About how old was he when you and Ms.
17  Bordeleau split up?
18  A.  About a year old.
19  Q.  So safe to say, it was about 11 years or so
20  ago that you and Ms. Bordeleau broke up?
21  A.  I don't remember the exact dates.
22  Q.  Okay.  But around the time Grayson was one?
23  A.  Yes, Sir.

Page 14

1   Q.  Prior to you and Ms. Bordeleau separating
2   did she live with you at Jonathan Street?
3   A.  31 Jonathan Road.
4   Q.  Did she live with you at 31 Jonathan Road?
5   A.  Yes, Sir.
6   Q.  And was that true since the house was
7   built?
8   A.  Yes, Sir.
9   Q.  How did you first meet Ms. Bordeleau?
10  A.  She was a hairdresser in Pelham at Sassy
11  Samples.  She cut my hair.  I asked her out on a
12  date.  And we got together at that point.
13      MR. CULLEN:  I'm going to just show you a
14  copy of your complaint.  And I'll just ask that we
15  mark this as Exhibit 1.  And ask you a few questions
16  from that.
17      (Rocheville Exhibit 1 was
18      marked for identification.)
19      (Document handed to witness.)
20  Q.  BY MR. CULLEN:  Sir, turn to page two,
21  Paragraph 14, at the very bottom.  You reference
22  that Goulden was fired.  Lieutenant Goulden was
23  fired by the Town of Brookline, New Hampshire.  That

Page 15

1   he had been the Chief and then was fired.  Is that
2   something you know for a fact?
3   A.  I was told that by Cheryl Bordeleau and
4   Tracy Goulden.
5   Q.  And is Tracy Goulden Thomas Goulden's wife?
6   A.  Yes, Sir.
7   Q.  Do you know if they are still married?
8   A.  I do not.
9   Q.  When did Tracy -- when did Ms. Goulden tell
10  you that her husband had been fired?
11  A.  I don't remember the specific dates.
12  Q.  Okay.  How about this.  How -- how -- when
13  was the last time you spoke with Ms. Goulden?
14  A.  I don't you remember the exact dates, Sir.
15  Q.  Okay.  Was it prior to your arrest in 2016?
16  A.  Yes, Sir.
17  Q.  Do you recall how much prior?
18  A.  I do not.
19  Q.  Do you know if it was more than a year
20  before your arrest?
21  A.  I don't recall, Sir.
22  Q.  And I think you told me that you heard that
23  from both Ms. Goulden and Ms. Bordeleau?

Page 16

1   A.  Yes, Sir.
2   Q.  Do you recall when Miss Bordeleau told you
3   that?
4   A.  I don't remember the exact dates.
5   Q.  Did either Miss Goulden or Miss Bordeleau
6   tell you why then Chief Goulden was fired from
7   Brookline?
8   A.  No, Sir.
9   Q.  Do you have any other independent knowledge
10  of why he was fired, if he was fired?
11  A.  I do not.
12  Q.  Okay.  On page three, Paragraph 15, you
13  state that on or before May 20th, 2014 Goulden began
14  to have a sexual affair with your girlfriend, Cheryl
15  Bordeleau.  How much -- well, first of all, how do
16  you know that to be true, if it's true?
17  A.  My son, Aiden Rocheville.  Mr. Goulden,
18  Thomas Goulden, bought him baseball equipment.  And
19  he overheard his mother talking.
20  Q.  And what did he overhear his mother say, or
21  what did he report to you?
22  A.  He basically told me his mother was dating
23  Thomas Goulden.  And that he had been to his ball

Page 17

1  games.
2  Q. Were you still together with Ms. Bordeleau
3  at that time?
4  A. Yes.
5  Q. Was she still living with you at that time?
6  A. Yes.
7  Q. Did you confront Miss Bordeleau about that?
8  A. Yes.
9  Q. And what did she say?
10 A. That her private affairs were none of my
11 business.
12 Q. Can I assume you disagreed with that?
13 A. I did disagree, yes.
14 Q. Is that what caused you and Miss Bordeleau
15 to split up?
16 A. I believe it had a large impact on our
17 relationship.
18 Q. Other than the comment made by your son,
19 Aiden, did you have any other evidence that Ms.
20 Bordeleau was having some sort of an affair or
21 relationship with Mr. Goulden?
22 A. Yes, I did.
23 Q. And what was that?

Page 18

1  A. A good friend of mine, Buddy Wilkins, who
2  lives in town, 19 Webster Avenue, witnessed Cheryl
3  Bordeleau and Officer Tom Goulden multiple times,
4  multiple locations in town while Officer Goulden was
5  on duty in a Pelham Police Cruiser. They were
6  parked side-by-side on Bridge Street and chatted for
7  hours.
8  Q. You attached to the interrogatories a
9  couple of photographs of a police car next to a --
10 what appears to be a white SUV.
11      (Document handed to witness.)
12 Q. And I'm showing you one of those that bears
13 the caption below that says, This went on and on for
14 months. Do you know who took that picture?
15 A. I did.
16 Q. And who is in the police car, if you know?
17 A. Officer Thomas Goulden.
18 Q. And whose white SUV is that in the
19 background?
20 A. That's Cheryl Bordeleau's. It's a Toyota
21 Sequoia.
22 Q. And when was this picture taken?
23 A. I don't know the exact date.

Page 19

1  Q. Relative to the date that's referenced in
2  Paragraph 15 of the complaint, May 20th of 2014, was
3  this picture taken before or after that?
4  A. Approximately the same time.
5  Q. Did you ever speak to Thomas Goulden about
6  your belief that he was having an affair with Ms.
7  Bordeleau?
8  A. Yes.
9  Q. And when was that?
10 A. At different times.
11 Q. How many times?
12 A. Three or four times.
13 Q. And was it around the same time as this
14 picture was taken?
15 A. Yes.
16 Q. What did you say to him?
17 A. That I wanted to make my relationship with
18 Cheryl work for the sake of the boys. He didn't
19 seem to care, one way or the other.
20 Q. What did he say specifically?
21 A. He basically told me to get away from him,
22 not to have any contact with Cheryl. And it was in
23 my best interest to stay away from Cheryl.

Page 20

1  Q. Was Cheryl still living with you at that
2  time?
3  A. Yes.
4  Q. In the -- any other conversations that you
5  had from -- sorry about that. Any other
6  conversations you had with Mr. Goulden regarding Ms.
7  Bordeleau? Do you remember him saying anything else
8  to you?
9  A. He basically told me he would take my life
10 and turn it inside out and there wouldn't be nothing
11 I could do about it.
12 Q. And when you say he basically told you
13 that, is that as close to a quote as you can get?
14 A. He said he got rid of her boyfriend in the
15 past.
16 Q. Anything else you remember Mr. Goulden
17 telling you with respect to his relationship with
18 Ms. Bordeleau or with respect to you?
19 A. Told me to watch my back.
20 Q. And this is all around the time that this
21 photo was taken, which was around --
22 A. It went on for months.
23 Q. Do you know where you get the date, May

Page 25

1   Cheryl Bordeleau very well.
2       Q.  Where did this conversation take place?
3       A.  Police station.
4       Q.  One time or more than once?
5       A.  More than once.
6       Q.  Anything else that Mr. McCarthy said to you
7   that made you believe that there was a conspiracy by
8   Thomas Goulden to have you arrested?
9       A.  I asked Mr. McCarthy why I was followed in
10  and out -- in or out of town.  Why I was escorted in
11  or out of town.  And he described it was the hour of
12  the night.  And then he smiled.  And he said, You
13  know why you're being escorted.
14      Q.  And what did you take that to mean?
15      A.  I was being harassed by the Pelham Police
16  Department and it was going to continue.
17      Q.  Did you have any other conversations that
18  you recall with Mr. McCarthy regarding Thomas
19  Goulden?
20      A.  Not at this time.
21      Q.  You mean not at the time?
22      A.  Not that I can recall at this moment.
23      Q.  Okay.  Anyone else that you spoke with that

Page 26

1   gave you information that led you to believe that
2   there was a conspiracy --
3       A.  Chief Joseph O'Roark.
4       Q.  You just -- I know you know how I'm going
5   to ask my question, but just let me get the whole
6   thing out.  Okay.  Is there anyone else, besides Ms.
7   Bordeleau, Ms. Goulden and Chief McCarthy that gave
8   you information that led you to believe that Thomas
9   Goulden was conspiring to have you arrested?  And
10  you answered Chief O'Roark.  What did Chief O'Roark
11  tell you.
12      A.  I called Chief O'Roark.  I had a meeting
13  with him.  I actually gave him copies of these
14  photographs.  And he explained that I pissed off the
15  wrong people.
16      Q.  And by the photographs you're indicating
17  the ones that are attached to your Answers to
18  Interrogatories?
19      A.  Correct.
20      Q.  Is that all he told you, that you pissed
21  off the wrong people?
22      A.  I wrote him a letter and the selectmen in
23  regards to I was being harassed.  And I was

Page 27

1   concerned that I would be charged with something
2   that I didn't deserve.  And that there was an
3   officer involved that was dating the mother of my
4   children.  And it was to the Board of Selectmen.
5   And I gave it to Chief O'Roark.
6       Q.  Is that when he said that you pissed off
7   the wrong person?
8       A.  Yes, Sir.
9       Q.  And did he tell you anything else?
10      A.  He said it would be in my best interest to
11  move out of town.
12      Q.  And you indicated that you showed him the
13  pictures that are attached to the interrogatories,
14  which I understand to take place right around the
15  time of May 2014 that's referenced in the complaint.
16  Is that around the time that you went to see Chief
17  O'Roark?
18      A.  I don't remember the exact dates.
19      Q.  Okay.  Is it around the time that the
20  letter that you said you wrote to the Board of
21  Selectmen was written?
22      A.  Approximately.
23      Q.  Approximately within a month?

Page 28

1       A.  Within a year.
2       Q.  Would you have waited a whole year after
3   the board's letter to go see the chief?
4       A.  No.
5       Q.  Did you ever get any response from the
6   board?
7       A.  No.
8       Q.  Okay.  Other than the people you've
9   mentioned so far is there anyone else who has
10  provided you information that leads you to believe
11  that Mr. Goulden was conspiring to have you
12  arrested?
13      A.  I don't recall at this time.
14      Q.  On Paragraph 19 you reference a lieutenant
15  that you refer to as John Doe, who advised you that
16  you should have kept your mouth shut while he was
17  doing his civil standby at your house.  Do you know
18  today who that person is?
19      A.  I do not.  He pulled up in an unmarked
20  cruiser.
21      Q.  Was this during the search warrant?
22      A.  No.  This was prior to it.
23      Q.  What was the civil standby for?

## Page 29

1  A. I had a problem with Michelle Stone. And I
2  needed her to vacate my house.
3  Q. How had you met Miss Stone?
4  A. On Match.
5  Q. And in September and October of 2016 had
6  she been living with you at 31 Jonathan Road?
7  A. Yes.
8  Q. Just you or anyone else?
9  A. She had a son with her.
10  Q. And approximately how long did Miss Stone
11  live with you at 31 Jonathan Road?
12  A. Couple of years, approximately.
13  Q. And when you asked her to leave is that in
14  October of 2016 when this civil standby took place?
15  A. Prior.
16  Q. Do you know how much prior?
17  A. I do not recall the dates.
18  Q. Okay. Within a week of the civil standby?
19  A. It was more like two or three weeks.
20  Q. Okay. How did you get into sort of the dog
21  rescue business?
22  A. Through ARNE, which is Animal Network of
23  New England, Donna Clark.

## Page 30

1  Q. And who's Donna Clark?
2  A. I believe she's a Director of ARNE.
3  Q. And approximately when was it that you
4  first got involved with ARNE?
5  A. Soon after I moved into my home.
6  Q. So around 2001?
7  A. Thereabouts. I don't recall the exact
8  dates.
9  Q. Prior to getting involved in ARNE had you
10  had any involvement with any sort of dog rescue or
11  dog fostering?
12  A. Off and on over the years I fostered
13  animals. Did what I could to help them get homes.
14  Q. I'm going to ask you some questions that I
15  think the easiest way to do this would be to show
16  you the search warrant affidavit. And use that to
17  help you with your memory.
18      MR. CULLEN: Perhaps, could you mark this,
19  please, as Exhibit 2.
20      (Rocheville Exhibit 2 was
21      marked for identification.)
22      (Document handed to witness.)
23  Q. BY MR. CULLEN: What I've shown you and

## Page 31

1  marked as Exhibit 2 is a search warrant affidavit
2  completed by Allison Caprigno and ultimately
3  offered -- issued by Judge Stephen. I want to go
4  through a few different statements that are in here
5  starting, really, at Paragraph Six. Paragraph Six
6  starts with, On September 30th, 2016 I spoke with
7  Kevin Rocheville about a dog at large complaint, and
8  I'm paraphrasing here. Do you remember that
9  incident?
10  A. Yes.
11  Q. Okay. A neighbor of yours, Kelly Salois,
12  complained about a dog; is that right?
13  A. I don't know a Kelly. And I don't believe
14  she lives anywhere near my home.
15  Q. Okay. When did it -- what happened when --
16  okay. Let me strike that. On September 30th, 2016
17  do you remember Miss Caprigno or Officer Caprigno
18  coming to your house?
19  A. Yes.
20  Q. And what did she say to you when she
21  arrived?
22  A. That was that there was a dog reported
23  loose.

## Page 32

1  Q. Okay. Did you have any loose dogs at that
2  time?
3  A. No.
4  Q. As of that time how many dogs were at your
5  house?
6  A. I don't recall.
7  Q. More than five?
8  A. Yes.
9  Q. More than ten?
10  A. I don't recall.
11  Q. What was the most number of dogs you recall
12  having at your house at one time?
13  A. A dozen anyway.
14  Q. If -- if Ms. Stone reported that you had
15  more than 30 at once would that be accurate?
16  A. No.
17  Q. Further down in this paragraph there's a
18  reference to a dog named, Ally, who I believe you
19  represented was a foster dog from the Whispers of
20  the Forgotten in New York?
21  A. Yes.
22  Q. And is that, in fact, where Ally was from?
23  A. She came from North Carolina, I believe.

Page 33

1  Q. How did Ally come into your possession?
2  A. A transport, I believe, brought her up.
3  Q. How was it that you had even heard about
4  Ally?
5  A. Through -- I believe it was through the
6  Internet, something Michelle found.
7  Q. Who arranged for Ally to be transported to
8  your house?
9  A. I believe it was Michelle.
10 Q. As of September 30th, 2016 Michelle had
11 been living with you for approximately two years?
12 A. Approximately.
13 Q. During that time how many dogs did Michelle
14 have transported to your house?
15 A. I don't recall the exact number.
16 Q. Was it dozens?
17 A. Maybe ten.
18 Q. Did Michelle keep these dogs, or did she
19 foster them to place them?
20 A. There was a few that she tried to adopt for
21 herself.
22 Q. And when you say, "Tried," did she succeed?
23 A. No.

Page 34

1  Q. Why was that?
2  A. I don't believe that they -- I don't know
3  exactly. I really don't.
4  Q. But you think it might have something to do
5  with paperwork?
6  A. I have no idea exactly what happened on
7  that circumstance.
8  Q. So she tried to adopt some. Forgive me.
9  Did she successfully adopt any?
10 A. No.
11 Q. And when she would try to adopt a dog, and
12 then not be able to, what happened to that dog?
13 A. I believe the dog would go out and be
14 adopted by another party.
15 Q. And who had arranged that?
16 A. One of the rescues.
17 Q. Did you also arrange to have dogs
18 transported to your house at various times?
19 A. I worked with a transport a few times.
20 Q. Who was that?
21 A. Well, we would all take an hour. And we'd
22 bring a dog. If a dog was coming from Florida
23 different people would take a length of the trip.

Page 35

1  And they would be bring it to another person. And
2  that person would bring it to another person. And
3  basically it would be part of a transport. That's
4  how they would do it. People would volunteer their
5  time to transport the animals.
6  Q. And you worked in that capacity sometimes?
7  A. A few times, I have.
8  Q. As a volunteer did you -- in any of those
9  times did you have dogs transported to your house?
10 A. The transports came to my house a couple of
11 times, different dogs.
12 Q. And then would some other volunteer pick
13 them up and take them to the next step?
14 A. Depending on the circumstances, yes.
15 Q. And how long would the dogs be housed in
16 your house between transports?
17 A. Sometimes a day. Sometimes a week.
18 Q. Were you working full-time back in
19 September of 2016?
20 A. In -- I don't recall, but I do know that I
21 tried to work as much as possible. If I had a union
22 job, and I had a day off I would go and repair a
23 piece of equipment. I was constantly trying to make

Page 36

1  a living.
2  Q. Six days a week most weeks?
3  A. Seven days a week.
4  Q. Most weeks?
5  A. Not all the time.
6  Q. As much as you could, though?
7  A. Yes. I was trying to pay my bills.
8  Q. The Massachusetts union jobs. Obviously, I
9  assume, they were in Massachusetts?
10 A. Yes, Sir.
11 Q. Boston or where?
12 A. All over the place. The union is based out
13 of Boston, but they could send me anywhere.
14 Q. Were those typically one-day jobs or
15 multi-day jobs from the union?
16 A. It depended. It was all over the place.
17 Q. The report that I was looking at, Paragraph
18 Six, indicates that Ally had just had seven puppies
19 within the last 24 hours. Is that something that
20 either you or Michelle told Officer Caprigno?
21 A. I believe that would be Michelle.
22 Q. And had the dog just had puppies?
23 A. Yes.

Page 49

1  whatever. And the ultimate understanding that I
2  have out of this whole incident was that the doctor,
3  when they put the stitch when -- I guess there's an
4  artery in there when they castrate a dog, that
5  stitch let go. And it caused Gotti to bleed out
6  inside. And as far as I'm concerned I had nothing
7  to do with it. I did everything correctly. And
8  then Jody Harris explained to me in detail that the
9  insurance company from the veterinarian was going to
10 pay all the vet bills.
11     Q. Okay.
12     A. That it was a mistake by Windham Animal
13 Hospital.
14     Q. Did that insurance company end up paying
15 those bills?
16     A. I do not know. Jody Harris and I did not
17 speak about it afterwards. She wouldn't let me have
18 anything to do with the dog. She said that, you
19 know, basically, the acting out by Michelle was
20 unprofessional.
21     Q. After that incident with Gotti and your
22 conversation with Harris did that change your
23 relationship with Jody Harris?

Page 50

1     A. Absolutely.
2     Q. In what way?
3     A. I explained to her that I didn't want to
4  foster any more of her animals. And that, you know,
5  I'm done. I didn't want to do any more.
6     Q. How did she take that news?
7     A. She was -- she was so upset. She was
8  screaming at me. She'd hang up, call back. Hang
9  up, call back. And I said, Jody, I want out of all
10 of this. I want these dogs in good homes. I'm
11 done.
12    Q. And at that stage how many dogs did you
13 have from her place, the Looking Glass Animal
14 Rescue?
15    A. Allison picked up four dogs that was
16 Jody's. She went to another rescue up in New
17 Hampshire somewhere.
18    Q. And that was at your request?
19    A. No. It was Jody Harris's request. She had
20 Allison come over to the house.
21    Q. On Paragraph Eight Caprigno writes that, On
22 October 6, 2016 she assisted Officer Ryan Donovan at
23 31 Jonathan Road for a criminal trespass, domestic

Page 51

1  disturbance involving Rocheville and Stone. Do you
2  remember the incident that that references?
3     A. That -- yeah. That's the day that I asked
4  Michelle to leave, to stop. Find a place to live.
5     Q. And when you asked her to leave what
6  happened?
7     A. She didn't want to leave.
8     Q. Was your asking her to leave in relation to
9  the Gotti incident the day before and her behavior?
10    A. I didn't want to do any more fostering.
11 And Michelle was involved in the fostering. We
12 didn't see eye-to-eye anymore.
13    Q. At the time that you asked Michelle to
14 leave how many dogs did she have at your property?
15    A. She didn't own any dogs. They were foster
16 dogs.
17    Q. Okay.
18    A. And I don't recall the exact amount.
19    Q. Did she -- did she leave that night?
20    A. Yes.
21    Q. Okay. After that did she ever live at your
22 property again?
23    A. I don't believe so.

Page 52

1     Q. Was she -- was Michelle angry with you?
2     A. Very upset.
3     Q. Very upset. When was the last time you
4  spoke with Michelle Stone?
5     A. I talk to her from time to time.
6     Q. Do you remember the last time?
7     A. I don't.
8     Q. Was it within this year of Covid that we've
9  had?
10    A. Yes.
11    Q. Do you ever talk to her about your lawsuit?
12    A. She doesn't want to hear it. And I don't
13 want to talk to her about it.
14    Q. So you have not had any substantive
15 conversations about it with her?
16    A. No.
17    Q. On Paragraph Nine it says, On October 7th
18 at 8:49 a.m. Michelle Stone came to the Pelham
19 Police Department to follow up. A little later it
20 says, Stone showed me pictures on her phone that she
21 had taken showing 20 to 30 dogs being kept in
22 plastic and wire-style crates. Do you remember
23 seeing pictures like that from Michelle?

Page 61

1  A. Yes.
2  Q. And when did she tell you that?
3  A. It was probably two weeks after everything
4  went down.
5  Q. I take it, during the time that -- between
6  the time that you asked Michelle to leave and the
7  search warrant were you and Michelle talking?
8  A. No.
9  Q. She's still pretty angry with you?
10 A. Yes.
11 Q. There's a reference here to a Sudbury
12 Animal Control Officer, Jennifer Condon. Is that
13 the person you were talking about?
14 A. Yes.
15 Q. Paragraph 12, Sir, it talks about an
16 October 11th unannounced follow-up by Caprigno at
17 your house. She indicates that she pulled into the
18 driveway. You met outside, met her outside with
19 three dogs. Do you recall this visit?
20 A. I believe that is when that lady came and
21 got the dogs that Jody wanted back.
22 Q. Okay. And is that why you had the dogs
23 outside, to deliver them?

Page 62

1  A. I believe what happened there is the lady
2  that came to get the dogs didn't even have leashes.
3  And she went to grab one. And the dog got loose.
4  And then, I believe, Allison, actually, had leashes
5  for her.
6  Q. Officer Caprigno later references a phone
7  call that she received from a Susan Young of Texas
8  from the Next Samaritan Rescue Group. Do you know
9  who that is?
10 A. Yes.
11 Q. And how did you first meet or get in
12 contact with Susan Young?
13 A. I had asked her about basically reimbursing
14 me for veterinarian bills.
15 Q. Did you have foster dogs that had come to
16 you from Next Samaritan Rescue Group in Texas?
17 A. Yes.
18 Q. Do you know how many?
19 A. I do not recall. That was a Michelle
20 dealing back and forth on the Internet thing.
21 Q. So your memory is that Michelle connected
22 with Susan Young over the Internet?
23 A. Yes.

Page 63

1  Q. And as a result of that she had dogs
2  transported to your house?
3  A. Yes.
4  Q. You're not sure how many?
5  A. No.
6  Q. Did you ever speak to Susan Young,
7  yourself?
8  A. Yes.
9  Q. About how many times?
10 A. Several times.
11 Q. Did you also get involved in making sure
12 the logistics worked out when these dogs got to you?
13 A. There were times where they asked me when I
14 would be home, or if it was possible that they could
15 deliver a dog, or they also asked me about taking
16 like an hour trip. Say, a dog from a length of the
17 trip that they were transporting. They were looking
18 for volunteers.
19 Q. How was it that you ended up paying vet
20 bills for the dogs that came up to you from Texas
21 from Miss Young's organization?
22 A. One of them was Onyx. They didn't want to
23 reimburse. Their attitude toward the dogs was just

Page 64

1  euthanize them. We don't have the money. We're not
2  going to spend the money. I believe I talked to her
3  the night that I had brought Onyx to Rockingham
4  Emergency. And she had no money. And she said she
5  couldn't facilitate any of the vet bills.
6  Q. And that's part of why you took it on
7  yourself?
8  A. I didn't want to the dog to die. And I
9  explained it to Michelle, that if you foster a dog
10 the people you're fostering it for, they have to pay
11 the vet bills. That's one thing that Jody Harris
12 did. She paid vet bills. Part of a foster
13 agreement.
14 Q. So Michelle didn't always follow through on
15 that?
16 A. No, Sir.
17 Q. Officer Caprigno writes that, Susan Young
18 had called to say two dogs had been found in Nashua
19 that were from the Next Samaritan Rescue Group. Do
20 you recall that?
21 A. I do not. At this time I do not. I don't
22 recall it.
23 Q. In Paragraph 13 Officer Caprigno reports

Page 65

1  that she received information from a Salem Animal
2  Control Officer Bliss. Do you know who Officer
3  Bliss is?
4      A.  No, Sir.
5      Q.  And Bliss, she says, reported to her that
6  she got a call from the MSCPA in Methuen, Mass, who
7  wants to surrender a sick Pit Bull for his friend.
8  Do you know what dog that was?
9      A.  That would have been Xena.
10     Q.  Okay. Is that Xena with an X?
11     A.  I believe so.
12     Q.  And how did your friend end up having
13 possession of Xena?
14     A.  I don't recall saying, "Friend," at all.
15     Q.  Okay. But how did this person end up
16 having Xena?
17     A.  I believe Xena came from a rescue Up State
18 New York. And somewhere along the line the dog
19 ended up being my dog. Like I adopted it. I didn't
20 even know it was my dog.
21     Q.  How does that happen?
22     A.  It had to be something with Michelle. I do
23 not know.

Page 66

1      Q.  So if you get a rescue that you're going to
2  foster do you get specific paperwork that assigns --
3      A.  You're supposed to.
4      Q.  Okay.
5          MR. AIVALIKLES: You've got to let him
6  finish asking his question.
7          THE WITNESS: Sorry.
8          MR. AIVALIKLES: That's okay.
9      Q.  BY MR. CULLEN: And then when the dog gets
10 adopted by someone is there another set of
11 paperwork?
12     A.  Yes.
13     Q.  All right. This is going to sound a little
14 callous, but is it kind of like the title of the
15 car, that it just goes to whoever it's supposed to
16 go to?
17     A.  Yes.
18     Q.  So at some stage the -- the papers for Xena
19 changed from her being a foster dog, for either you
20 or Michelle, to being your dog?
21     A.  Correct.
22     Q.  And you don't know how that happened?
23     A.  No, Sir.

Page 67

1      Q.  Do you think Michelle completed that
2  paperwork?
3      A.  I don't know.
4      Q.  When did you learn Xena had officially, at
5  least on paper, become your dog?
6      A.  I don't recall the date.
7      Q.  Was it before or after the search at your
8  house?
9      A.  It was after.
10     Q.  Do you know how it was that Xena ended up
11 in the care of somebody -- who brought Xena to
12 Methuen, Massachusetts?
13     A.  I brought Xena to Methuen, Massachusetts.
14     Q.  Who did you leave Xena with?
15     A.  I have a friend up in Hudson. And I asked
16 him to help me find some of these dogs homes.
17     Q.  This is in the gap between when Michelle
18 Stone leaves and when the search warrant happens?
19     A.  Yes.
20     Q.  Is it fair to say you're trying to find
21 homes for the dogs that Michelle has brought to your
22 house and is no longer caring for?
23     A.  Can you rephrase that question?

Page 68

1      Q.  Yeah. I'll try it again. So in the gap
2  between when Michelle Stone leaves your house and
3  the search warrant the dogs that she's fostering are
4  still at your house; is that fair? Is that correct?
5      A.  No.
6      Q.  Okay. Where are the dogs that she's
7  fostering?
8      A.  Jody Harris had a bunch of them picked up.
9      Q.  So let me -- you're right. I wasn't as
10 clear as I should have been. At the time Michelle
11 Stone first left your house -- I think, according to
12 the papers we have it as about October 6th of
13 2016 -- she doesn't take any dogs with her when she
14 leaves, I assume?
15     A.  No, Sir.
16     Q.  So as of that time when she physically
17 leaves the house the dogs she's fostering are still
18 at your house?
19     A.  Correct.
20     Q.  And over the next two weeks are you
21 dispersing those dogs, either back to their rescues
22 or finding homes for them?
23     A.  It had been going on well before that.

17 (Pages 65 to 68)

Page 69

1  Q. All right. This was an ongoing thing?
2  A. Yeah. Basically, I was fostering. So the
3  idea of fostering is to hold a dog until it can go
4  to a different home or be adopted.
5  Q. Okay. So in getting Xena why were you
6  approaching a person in Hudson to find a home for
7  Xena?
8  A. It was a friend. And he knew a lot of
9  people. And my understanding was that we would find
10 these dogs homes, so that they have a home.
11 Q. And who was that friend?
12 A. Dubowik.
13 Q. I'm sorry?
14 A. Dubowik is his name.
15 Q. That's his last name, I assume?
16 A. Yeah.
17 Q. Do you know his first name?
18 A. He goes by different names, but it's
19 Dubowik. Dan Dubowik.
20 Q. And how long have you known Dan?
21 A. Ten years.
22 Q. And you -- was it Dan who found him a
23 place -- found Xena a place in Methuen that you then

Page 70

1  delivered to it to?
2  A. I'm confused, Sir.
3  Q. Sure. My understanding was that we've got
4  this sick Pitbull in Methuen, being Xena; is that
5  fair?
6  A. Yes.
7  Q. Okay. And if I understood you correctly,
8  you went to your friend, Dan, in Hudson to look for
9  a home for Xena. And he connected you to somebody
10 in Methuen, who might be able to take the dog?
11 A. Incorrect.
12 Q. Okay. What actually happened?
13 A. I had gone to Methuen to see if we could
14 help Xena out. I had brought her to a vet in
15 Tyngsborough. And she was having issues with her
16 stomach. And basically we had tried different
17 plans, as far as foods and things that were good for
18 her stomach, but she deteriorated very, very fast.
19 Q. Was she getting -- was she getting really
20 thin because of her stomach issues?
21 A. Yes.
22 Q. Was she having diarrhea?
23 A. Yes.

Page 71

1  Q. How long had you had Xena before you
2  brought her to the clinic in Tyngsborough?
3  A. She had been with me a couple of months. A
4  little longer. I don't know the exact time frame.
5  Q. Okay. But as of October 12th, 2016 she was
6  now in Methuen?
7  A. No.
8  Q. Where was she?
9  A. She was at my house.
10 Q. Had she recovered from her illness?
11 A. No. We were trying different foods.
12 MR. CULLEN: There's a photo here that I'll
13 just mark as Exhibit 3.
14 (Rocheville Exhibit 3 was
15 marked for identification.)
16 (Document handed to witness.)
17 Q. BY MR. CULLEN: This photograph, which has
18 a date of -- I believe it has a date of October 18,
19 2016, the date of the search warrant, is that feces
20 from Xena?
21 A. No.
22 Q. Do you know what that is?
23 A. It would probably be Ally.

Page 72

1  Q. Okay. The dog who had had the puppies?
2  A. Yes.
3  Q. Do you know why the -- the dog pooped on
4  the ground?
5  A. Well, if they storm the front door, as I've
6  seen, where they lay the door down on the floor,
7  probably scared the dog. And she was giving the
8  pups milk. And her digestive system probably was on
9  high range because she was feeding nine puppies.
10 Q. Paragraph 14, actually, references Dan
11 Dubowik. At least Officer Caprigno spells it,
12 D-u-b-o-w-i-c-k. Do you know if that's the correct
13 spelling?
14 A. I do not, Sir.
15 Q. It looks like he runs an excavating
16 business?
17 A. He sells equipment.
18 Q. Okay. Officer Caprigno reports here that
19 she had received information from Hudson Officer
20 Matthew Blazon indicating that Dan Dubowik had
21 reported five abandoned puppies. Had you delivered
22 five dogs to Dan?
23 A. The dogs were to be found homes. They were

Page 73

1  not abandoned.
2  Q. But was he caring for them while --
3  A. Yes. He said he would help me with them.
4  Q. So he was caring for them while you and he, together, were looking for homes for them?
6  A. Yes.
7  Q. Blazon describes three full-sized Pitbull dogs, one was a white dog visibly emaciated with a bony structure and cataracts in both eyes. Do you know what dog that was?
11  A. It was -- it would be Xena.
12  Q. Okay. That would be Xena. Another was a black Pitbull. And a third was a white and brown mix Pitbull that looked like it had recently been bred. Would that third one be Ally?
16  A. No. Ally was confiscated by Officer Caprigno.
18  Q. Well, when was that that she confiscated her? Oh, at your house on the search warrant?
20  A. Yes, Sir.
21  Q. So she wasn't temporarily at Dubowik's --
22  A. No, Sir.
23  Q. -- a week earlier? Okay. Do you know

Page 74

1  which dog the white and brown Pitbull mix was?
2  A. I do not. I don't know them by name like that.
4  Q. Okay. But it's one of the dogs that you delivered to Dan for him to care for.
6  A. Yeah. At this time I don't remember the dog's name.
8  Q. That's okay. Going to Paragraph 17, Sir. There's a report of another call from Officer Condon in Sudbury, Mass referring to a property at 1030 Concord Road in Sudbury. Is that Macone's address?
12  A. Yes, Sir.
13  Q. All right. She reported that there were four dogs stored in the rear shop on that property. Do you know if any of your dogs were there?
16  A. Yes, Sir.
17  Q. Are those the four that you thought Sarah was adopting?
19  A. No, Sir.
20  Q. Which four are these?
21  A. One dog named Kevin that I got that was -- he had been in a dog fight prior to me getting him.
23  Q. Okay. Do you remember what the other ones

Page 75

1  were?
2  A. I do not at this time.
3  Q. Okay. How was it that these four dogs came to be at 1030 Concord Road?
5  A. I was working for Doug at the time. And I was there quite a bit, so it was easier for me to take care of them when I was there. I was traveling back and forth from home to there.
9  Q. Okay.
10  A. But while I was there I was able to feed and water the dogs and make sure they were good.
12  Q. Okay. And so you had dogs at home, also, right?
14  A. Yep.
15  Q. So having four dogs at Macone's probably made it a little easier?
17  A. The one dog, Kevin, I was concerned with, and had brought him to the vet. They had given me ointment to -- because he had a couple of things on his paws. And, basically, it was easier for me to be with him all day, be working in the next shop over. Easy to run over and make sure he had water and food.

Page 76

1  Q. Then did those dogs stay there for the night. And you'd see them the next day?
3  A. Yes, Sir.
4  Q. And Condon indicates that the other dogs may have been named Lilly, Beyrun, B-e-y-r-u-n, and Oreo. Does that refresh your recollection as to the other dogs?
8  A. It's possible, Sir.
9  Q. Rocheville stated that they were his personally owned dogs. Were those ones your own ones?
12  A. I don't remember making that statement, Sir.
14  Q. Okay. But do you know if they were your own?
16  A. As far as I can see they were all foster dogs at the time.
18  MR. CULLEN: Okay. I forget if we marked the affidavit.
20  COURT REPORTER: We did.
21  MR. AIVALIKLES: That's two.
22  Q. BY MR. CULLEN: Were you present when the search warrant was executed?

Page 85

1 (Rocheville Exhibit 10 was
2 marked for identification.)
3 (Document handed to witness.)
4 Q. BY MR. CULLEN: Looking at that document
5 there's a series of medicines listed on the first
6 page. Are those all medicines for various dogs that
7 were in your care, or Michelle's care?
8 A. Yes. And some of it is for people.
9 Q. Are you able to split out the ones that are
10 for people?
11 A. The Benadryl is for people. Using it for
12 allergy relief.
13 Q. Sure.
14 A. I'm not a chemist or a pharmacist, so I
15 wish I could help you further.
16 Q. Okay.
17 A. I don't know.
18 Q. Would it be fair to say the majority of
19 those are for dogs?
20 A. Some of them are. I don't know if it's the
21 majority.
22 Q. On the bottom it says there's a Gray
23 Brindle in the first floor bathroom, a Pitbull

Page 86

1 female. Do you see that?
2 A. Yep.
3 Q. Do you remember having a -- leaving for
4 work that morning and leaving a Pitbull in the
5 bathroom?
6 A. I do not.
7 Q. Is that the dog that did the damage to the
8 door, to your knowledge, one way or the other?
9 A. I don't believe so, no.
10 Q. Going onto the second page. On the Master
11 Bedroom it indicates there were four puppies
12 Rottweiler mix. Those would be Ally's puppies, I
13 assume?
14 A. Yes.
15 Q. And then it says, Back left bedroom, Black
16 and Tan Rottweiller mix female. Is that Ally with
17 the purple collar and skulls?
18 A. What are skulls? What's the reference to
19 the skulls?
20 Q. I think it indicates a collar with skulls.
21 Purple collar with skulls.
22 A. I -- I don't recall, Sir.
23 Q. Okay.

Page 87

1 A. I don't remember.
2 Q. Okay. Did Ally and the puppies stay in the
3 same room when you were away, or did they stay in
4 separate rooms?
5 A. I would take Ally outside on a leash,
6 which -- so she would get some air and walk around
7 on the grass. And if she had to pee or poop she was
8 outside. Give her a break from the puppies. Not
9 for long periods of time, but to get her some air.
10 Q. And then after that would she go back in
11 with the pups?
12 A. Yes, Sir.
13 MR. CULLEN: I'm going show you a Police
14 Narrative. Reference 16-954-OF. And we'll just mark
15 that as Exhibit 11.
16 (Rocheville Exhibit 11 was
17 marked for identification.)
18 (Document handed to witness.)
19 Q. BY MR. CULLEN: You're welcome to look at
20 as much of this as you want, Mr. Rocheville. I,
21 actually, just want to turn your attention, when
22 you're ready, to the list of dogs on page three.
23 A. (So indicated.)

Page 88

1 Q. Officer Caprigno indicates in her report
2 that Michelle Stone stated that these dogs were in
3 the house when she moved out on or about October
4 6th, 2016. There's about 35 of them. Was that
5 correct, what she said to Officer Caprigno, that
6 those 35 dogs were at your house when she moved out?
7 A. I don't believe so, no.
8 Q. Do you know approximately how many dogs
9 were at your house when Miss Stone left?
10 A. I do not, Sir.
11 Q. As I look through the list I notice that
12 No. 23 is Ally and eight puppies. So if you add
13 those eight puppies to the 35 we're up to 43 dogs at
14 the house. Would you agree with me that if, indeed,
15 there were 43 dogs, including the puppies, at the
16 house at any one time that would be too many?
17 A. Yes.
18 Q. Too many for you and Michelle to care for?
19 A. It was my understanding that puppies
20 weren't considered because they were less than two
21 weeks old at the time.
22 Q. Excluding the puppies, if there were
23 actually 35 dogs at your house at one time would you

Page 89

1  agree that was too many?
2      A.  Absolutely, I would agree to it.
3      Q.  And you mentioned that Michelle was pretty
4  mad at you after you had asked her to leave. Do you
5  have any reason to believe she wouldn't have at
6  least told Officer Caprigno that all these dogs were
7  at the house?
8      MR. AIVALIKLES:  Objection. You can
9  answer, if you can.
10     A.  Could you rephrase the question.
11     Q.  Do you have any reason to think that Stone
12 didn't actually tell Caprigno that these 35 dogs
13 were at the house?
14     MR. AIVALIKLES:  Objection.
15     A.  Still not understanding what you're saying,
16 Sir.
17     Q.  Well, the report indicates that Michelle
18 Stone told Officer Caprigno that these 35 dogs were
19 at the house at the time she left. And you had also
20 indicated to me that Michelle Stone was pretty mad
21 at you or pretty upset, anyway, at that time. I'm
22 asking if you have any reason to believe that
23 Michelle did not actually tell Caprigno that there

Page 90

1  were these 35 dogs there?
2      A.  I've answered the question already.
3      Q.  Okay. I'm sorry. I guess I didn't get the
4  answer. I think the answer is she could have said
5  that?
6      A.  We've already stated that she was upset.
7      Q.  And because she was upset she could have
8  said that?
9      A.  I don't know exactly what Michelle said or
10 didn't say --
11     Q.  Okay. That's fair.
12     A.  -- to the officers.
13     Q.  Perfectly fine. Good answer. On Paragraph
14 22 of the complaint, which was marked as Exhibit 1,
15 you reference that in December of 2016 you had an
16 incident in the lobby with Officer or Lieutenant
17 Keenliside, K-e-e-n-l-i-s-i-d-e. It's page three,
18 Paragraph 22 of the complaint. I think what you
19 have in front of you might be the Interrogatories.
20 It's that one. (Indicating.)
21     (Document handed to witness.)
22     A.  Thank you. Your question again, Sir?
23     Q.  Yeah. Just referencing that paragraph can

Page 91

1  you tell me what happened in the lobby that day.
2      A.  Yes.
3      Q.  What happened?
4      A.  I went in to pay the vet bill. And the
5  bill for boarding the dogs. And Officer Keenliside
6  asked me -- can I quote this?
7      Q.  Yes.
8      A.  What the fuck are you looking at? What is
9  your fucking problem? And he came over. And I was
10 talking to Allison. And he went around Allison.
11 And he bumped me in the chest. He gave me one of
12 these. Pushed me back. (Indicating.)
13     Q.  So he chest bumped you back?
14     A.  Yep. He told me to go for it. I told him,
15 Merry Christmas.
16     Q.  When you first entered the lobby was
17 anybody in the lobby?
18     A.  No.
19     Q.  Did you go up to the glass and ask for --
20     A.  I did.
21     Q.  -- Allison? And did Allison Caprigno come
22 out?
23     A.  It took a while.

Page 92

1      Q.  Okay. When she came out did she come out
2  alone?
3      A.  No.
4      Q.  Did she come out with Officer Keenliside?
5      A.  Yes, Sir.
6      Q.  And when she came out who spoke first; you,
7  Officer Caprigno or Officer Keenliside?
8      A.  Officer Keenliside.
9      Q.  And is that when he said that to you?
10     A.  Yes.
11     Q.  That was the first exchange between any of
12 you?
13     A.  Absolutely.
14     Q.  And how long after they entered the lobby
15 did he make that statement?
16     A.  As they walked in.
17     Q.  Had you ever seen him before?
18     A.  Yes.
19     Q.  And when was that?
20     A.  I worked in town doing septic systems. I
21 had a job over on the Cobbetts Pond, -- not Cobbetts
22 Pond. It was for Don Rodding. I don't recall the
23 exact address, but I had to cross a road with the

Page 97

1  insurance.
2      Q. Where does Ms. Milgroom work out of?
3      A. Andover.
4      Q. Andover, Mass?
5      A. Yes, Sir.
6      Q. And do you have an idea how to spell her
7  last name?
8      A. I do not, but I have her card and
9  information.
10     Q. Okay. I'll talk to your lawyer about
11 getting that later. In the Answers to
12 Interrogatories at Answer 19 I think you -- I don't
13 know if you still have these in front of you.
14 There's a copy here. Sorry.
15         (Document handed to witness.)
16     Q. And the question asks you to identify
17 people who have indicated to you that your
18 reputation has been damaged as a result of the
19 conduct of the defendants. What I'd like you to do
20 is tell me if any of these people have indicated to
21 you that they -- strike that. After your -- after
22 the search warrant was executed and the -- you were
23 arrested there was some newspaper articles about it;

Page 98

1  is that right?
2      A. Correct.
3      Q. Were there also some web posts about it on
4  Facebook or elsewhere?
5      A. There's 17 articles against me on Google as
6  we speak.
7      Q. And do those all stem from your arrest in
8  this case?
9      A. Yes, Sir.
10     Q. And is it those articles that have caused
11 you the damage in your community?
12     A. There isn't anybody in town that will hire
13 me. After that went down nobody would even talk to
14 me.
15     Q. And it stems from the search warrant and
16 the arrest?
17     A. Well, and the publicity; the newspaper
18 articles, the TV article. I was on every channel.
19 Allegations were made. And people saw them on the
20 news, so they just assume they were correct.
21     Q. These were the allegations that you were a
22 dog hoarder or dog abuser?
23     A. Yeah. 25 years in Local 4, and the

Page 99

1  business manager told me that he can't put me to
2  work because of bad public relations. And I need to
3  get my personal life in order.
4      Q. And what was his name?
5      A. The business agent's name is William
6  McLaughlin. I believe he's on the next page. Can't
7  see. David Fantini, Paul McGarco.
8      Q. I see it there, Sir, about a third of the
9  way down.
10     A. A lot of these names are business agents.
11 The way that works is the business agents dispatch
12 the union employees. I hold a complete hoisting
13 license for the State of Massachusetts, which means
14 there's no restrictions on my licenses, which means
15 when the business has a gentleman that doesn't show
16 up or is sick and/or doesn't feel well, and the
17 business agent is stuck in the middle of it, and he
18 needs to have a crane operator they call an ace in
19 the hole. He can call me. I can go to the job. I
20 drug test with no issues. I've never had any bad
21 drug test. And I can run any piece of equipment.
22 And I can also fix the equipment. And having a
23 union book, being able to make a living with that

Page 100

1  kind of wages and those kind of benefits and
2  insurance, and having two children to pay child
3  support every week, it's imperative. By losing that
4  took my livelihood away.
5      Q. Did -- do you not do any work now for the
6  union?
7      A. He had dispatched me to one job. I was on
8  Dock Ave. And a couple of guys had made comments to
9  me about a dog abuser. The business agent came and
10 removed me from the job, so that he didn't have any
11 altercations. And that's where it ended up, in the
12 office of business agents. They actually brought me
13 in front of the executive board. And I thought they
14 were going to pull my book, but they didn't. They
15 wanted me to explain, which I can't.
16     Q. When was that?
17     A. It was about a year after the incident.
18 Went down when they stole my house. And they
19 criminally charged me and arrested me, stormed my
20 house. I've tried several times with the different
21 business agents. They just don't want anything to
22 do with it.
23     Q. And how much, if any, less do you earn