UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF NEW HAMPSHIRE

| | |
|---|---|
| Kevin Rocheville, ) | |
| ) | |
| v. ) | |
| ) | |
| Thomas Goulden, Matthew Keenliside, ) | Civil Action No. 19-CV-01169-PB |
| Brian McCarthy, Joseph O'Roark, ) | |
| Michael McCall, Allison Caprigno, ) | |
| Jody Harris-Stern, John Does, ) | |
| Jane Does and Town of Pelham, NH ) | |

## AFFIDAVIT OF KEVIN ROCHEVILLE

KNOW ALL MEN BY THESE PRESENT, that I, Kevin Rocheville, of Pelham, NH under oath depose and say as follows:

1. I reside at 31 Jonathan Road, Pelham, NH, 03076 and I am 56 years old.

2. My educational background consists of attending the University of Lowell. However, I did not obtain a degree. I have taken vocational training courses and seminars at the Greater Lowell Technical School for which I received a diploma as a Phase 3 Auto Mechanic.

3. I have no criminal record.

4. For the past twenty (20) years I have been actively involved with rescuing dogs. I have taken various training courses in handling dogs. I was a volunteer in assisting the Town of Pelham concerning dog issues. I volunteered my services to various dog adoption facilities and I have always been concerned with the welfare of dogs. It is my belief that dogs should not be euthanized simply because they do not have a home. I have various certifications relative to the care of rescue dogs. I have worked for ARNE for over ten years at the Pelham Fish and Game facility kennel, which is operated by the Town of Pelham and staffed by ARNE Members. At this

1

facility, I fabricated kennels, replaced fencing, brought in a thousand gallons of water when the facilities well failed and I brought in additional gallons of water for the dogs. I also ran errands for the facility by bringing the dogs to veterinary appointments, dropping dogs off, etc. I spent approximately five thousand dollars ($5,000.00) at Angel Memorial Hospital for a rescue dog, Onyx, who was treated for the parvovirus. Onyx was one of the dogs that was confiscated by the Pelham Police Department. Officer Caprigno confiscated all of the veterinary bills. She told me this bill was fraudulent. I even saw a post on a social medial site regarding her fraud claim. This information could have only come from Officer Caprigno. She also told me that the dogs that I rescued were to be euthanized.

5. I have expended thousands of dollars in veterinarian bills for the rescue dogs that I have rescued in the past as well as those rescue dogs that were confiscated. I found adoptive homes for dogs that I've rescued. I've spent thousands of dollars feeding dogs that I've rescued in addition to other significant expenses. As a result of the criminal charges brought against me by the Pelham Police Department, I was forced to expend thousands of dollars for the representation of an attorney to fight the criminal charges.

6. Thomas Goulden was employed by the Town of Brookline, New Hampshire as the Chief but was fired on or about April 30, 2010. After Goulden was fired by the Town of Brookline he was hired by the Town of Pelham, New Hampshire as a police officer. Shortly after his hire by the Pelham Police Department, Goulden left to become the Chief of Police for the Town of Shirley, Massachusetts. While serving as Chief for approximately two (2) years, Goulden was fired and was rehired by the Town of Pelham, New Hampshire as a police officer.

7. On or before May 20, 2014, Goulden began to have a sexual affair with my girlfriend, Cheryl Bourdeleau, who is the mother of my two sons. Goulden previously had a sexual relationship with Bourdeleau when she was eighteen-years-old (18).

2

8. On or about May 22, 2014, I informed Goulden's wife of the sexual affair that Goulden was carrying on with Cheryl Bourdeleau.

9. Goulden admitted to his wife, Tracey Goulden, that he had a sexual relationship with Cheryl Bourdeleau.

10. After, I informed Goulden's wife of the sexual relationship with Cheryl, Goulden, Keenliside, John Does, Jane Does and Caprigno engaged in a concerted, intentional campaign to punish and humiliate me. As a result of their conduct, my life in the Town of Pelham, New Hampshire was "living hell". This conduct was motivated to make me pay for telling Goulden's wife about his infidelity and to drive me out of town. Attorney McCall offered me a plea deal. He said that if I moved out of town, they would dismiss the charges against me.

10a. There was a No Trespass Order issued against Cheryl Bordeleau. She was not allowed to come onto my property. Cheryl told the police that she entered my property, having full knowledge of the No Trespass Order. As the victim, I requested that the Defendants file charges against her for violation the No Trespass Order. They refused to do so.

13. On or about September, 2014, Goulden advised me that if "I didn't watch it, he would put a round in my head". I was stopped by Goulden and requested to perform field sobriety testing. While performing the field sobriety tests, Goulden pushed me. No charges were filed by the Defendants, as a result of this stop.

12. John Doe, a Lieutenant, advised me, on or about October 18, 2016, when he was acting as a civil standby at my residence, that "you should have kept your mouth shut and not told his wife" and when you "fuck with one of us, you fuck with us all."

14. In December 2016, I went to the Pelham Police Department to pay some veterinarian bills in order to retrieve some of my dogs that were confiscated. While in the lobby I was assaulted by Lieutenant Keenliside. Lieutenant Keenliside bumped into my chest and then

3

said, "What the fuck are you looking at", "what is your fucking problem?" Lieutenant Keenliside and Caprigno began to laugh at me. The bump I received from Lieutenant Keenliside caused a bruise.

15. When I walked out of the Police Department, there were a number of Pelham Police cruisers blocking my vehicle and my ability to back out of the parking space. After forty-five (45) minutes the police cruisers left.

16. I brought to Chief McCarthy, in his capacity as acting Chief, the intimidation campaign that was being waged against me by the Pelham police officers. McCarthy told me that he would look into it. Upon information and belief McCarthy took no steps to stop the intimidation and harassment campaign waged by the Pelham Police Department Officers and the intimidation and harassment continued while he was still employed by Pelham. When Chief O'Roark, was Chief, I also advised him of the harassment yet the campaign of intimidation and harassment continued. The intimidation was severe and I feared for my well-being. I also contacted the Federal Bureau of Investigation (FBI) and spoke with Agent Katherine Thibeault.

17. According to Edmund Gleason, who was chairman of the Pelham Board of Selectmen, as of June 10, 2014, he documented at least one stop of my vehicle by Officer Montano. Officer Montano stopped me on February 14, 2014 at 7:08 p.m., for failure to use a my turn signal when I made a left turn. Officer Montano never asked for my driver's license or registration and he let me go without issuing a summons. On April 7, 2017, I was stopped by Lieutenant Anne Perriello. Lieutenant Perriello claimed she stopped my because I was using my cell phone while driving. I videotaped this stop. No charges were filed. There were a number of stops over a two and one half year period in which no charges were filed, yet they do not appear on the police logs.

18. Officer Caprigno, who was the animal control officer, obtained a search warrant to search my residence for abused animals.

19. In addition to Office Caprigno, there were at least six police officers and two police officers from a street crime unit who were present during the search warrant.

20. Despite the fact that I have never had a criminal record, no motor vehicle record nor engaged in any prior conduct that would warrant the use of nine police officers to execute an Animal Cruelty Warrant, the police officers gained entry to my residence by smashing my front door. The police officers damaged my entry door unnecessarily. Further, there was no need to use this excessive force as the door was unlocked. My neighbor, Richard Tarpey, witnessed the police enter my home while carrying military grade rifles.

21. The use of the forced entry by the Pelham Police Department and the excessive number of police officers present was part of the Department's systemic campaign to harass, frighten and drive me out of the Town of Pelham.

22. The rescue dogs that I fostered and that were the subject of the criminal complaint, were in my residence for approximately two months.

22a. Beginning on or after October 18, 2016 Caprigno threatened my ex-girlfriend, Michele Stone, who is a registered nurse. Even though Michele admitted to Officer Caprigno that she helped to care for the rescue dogs, no charges were filed against her.

23. On or about October 18, 2018, Michele did track my location and when Officer Caprigno would call her, she would ask about my location.

24. In addition to the activity that was a part of the concerted campaign of intimidation and harassment, I was slandered by various people and was called a "vicious little man" and an "evil little man" by Caprigno.

26. Michele is familiar with Officer Caprigno in her capacity as the Animal Control Officer for the Town of Pelham. Sometime in October of 2016, Allison Caprigno came to my residence that I shared with Michele, to advise of a loose dog complaint. She told us the Pelham

5

Police Department had received a complaint that a dog was running up the street and had chased someone. She provide us with a description of the dog. The only dog we had at that time that matched the description was Allie, who was heavily pregnant and was not even able to go up the stairs by herself. Michele had been carrying Allie up and down the stairs and caring for her. Allie could not have been outside, let alone running down the street chasing someone.

27. The next time Michele had contact with Allison Caprigno was the night she left my residence at my request on October 6, 2016. She was very upset with me.

28. Officer Caprigno told Michele that I was a "vicious little man" and an "evil little man".

29. On or about October 26, 2016 Officer Caprigno caused to be issued ten (10) Class A Misdemeanor Complaints Alleging Animal Cruelty against me.

30. As a result of the criminal charges and the widespread publication of these charges in area newspapers and television news coverage (WMUR, Fox TV and Channel 7), my parental rights to my two (2) sons has been curtailed and my relationship with my two sons has been greatly impacted. Cheryl Bordeleau is the mother of my two children. A number of internet postings held me up to ridicule and the publication of the false information destroyed my livelihood, business and business reputation. This conduct exacerbated my emotional distress. It was to the extent that people were calling me a "monster".

31. As a result of the publication of my arrest for animal cruelty, my name appeared on the television news coverage and in the newspaper that was circulated in the Pelham area as well as state wide and on the internet. As a result of the false charges, I was subjected to a barrage of verbal abuse, attacks, insults, and intimidation by the general public. The publication of my arrest and the allegations were published on local television, local newspapers and the internet, to include social media pages. These articles and stories were a result of the Pelham Police Departments

6

efforts to publicize my arrest. Just about everyone I knew avoided me because of the allegations that were being made against me. I was devastated because I love dogs and have saved many from death. I could not bear that others thought I was a dog abuser.

32. Officer Caprigno on or after October 18, 2016 disseminated a derogatory statement that was heard by third parties as follows: "He is an evil little man." She further stated that I "needed counseling, and was not right in the head." Officer Caprigno repeatedly threatened that I "would be going to jail for at least two (2) years" and "pack your toothbrush." She said she would "destroy" me, that I would "never own another dog." One time when she came to my house for an inspection, she told me with a grin that Oreo or Bravo had been "euthanized" and that Cooper was "euthanized." These and other statements were made purposely to harass and cause me emotional distress.

33. As a result of the publication of my arrest and the dissemination of false, derogatory information, the business manager of Local 4 stated that, "he could not put me on any jobs because of the bad P.R and I needed to straighten out my personal life." I had been a member of Local 4 for twenty (20) prior to my being removed from the availability list for jobs.

34. As a result of my inability to work the union jobs, I lost a minimum of $1,000 per week. I had to sell my equipment, at a significantly lower price than what they were worth to pay for my defense attorney's fees and my living expenses. My house was subject to foreclosure and I have filed personal bankruptcy, under Chapter 13, seeking a reorganization that has been approved by the Bankruptcy Court.

35. At a hearing prior to the State nol prosing the charges against me, Judge Stevens of the Salem District Court stated to the Pelham Police Prosecutor, "Don't bring this in front of me again. Don't waste the Court's time.". Unfortunately, Office Caprigno's threat of "destroying" me came very close to being accomplished. I have suffered significant distress and financial loses as

a result of the unnecessary publication of the allegations that were made against me, the derogatory statements and the campaign to evict me from the Town of Pelham.

36. Even one of the members of the Pelham Police Department questioned the probable cause for the issuance of the Search Warrant. (see attached email dated October 13, 206 from Officer Matthew Keenliside to Officer Chase) (Exhibit # 2).

37. In a police report, Officer Caprigno stated that the rescue dogs "appeared to be in good health". After the Search Warrant was executed, Officer Caprigno was interviewed by a reporter from Boston 25 News. The conversation was reported in a news story that was shown via television and is available online as well. During the conversation, the reporter asks "if it was usual that dogs would be returned to an accused abuser". Officer Caprigno replied, "Uh, not normally. I think it's safe to assume that he was thinking he was doing a good thing, and when it came down to it, he got overwhelmed."

38. I did not cause any of the medical conditions that the rescue dogs had or developed. My conduct was not criminal except in the eyes of those that wanted to punish me because I disclosed the affair.

Dated: September 16, 2021

_____
Kevin Rocheville

STATE OF NEW HAMPSHIRE
COUNTY OF HILLSBOROUGH

Personally appeared the above named Kevin Rocheville, this 16th day of September, 2021, and made oath that the within statements made by her are true to the best of her knowledge and belief.

Before me,

_____
Notary Public/Justice of the Peace

8

LISA M CENSABELLA
Notary Public - New Hampshire
My Commission Expires Aug 4, 2026

UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF NEW HAMPSHIRE

| | |
|---|---|
| Kevin Rocheville, | ) |
| | ) |
| v. | ) |
| | ) |
| Thomas Goulden, Matthew Keenliside, | )   Civil Action No. 19-CV-01169-PB |
| Brian McCarthy, Joseph O'Roark, | ) |
| Michael McCall, Allison Caprigno, | ) |
| Jody Harris-Stern, John Does, | ) |
| Jane Does and Town of Pelham, NH | ) |
| | ) |

## AFFIDAVIT OF MICHELE STONE

KNOW ALL MEN BY THESE PRESENT, that I, Michele Stone, of Lebanon, NH under oath depose and say as follows:

1. I have been a Registered Nurse for 19 years.

2. I am in the process of finalizing my academic requirements to obtain a Master's Degree in Nursing.

3. I am familiar with Allison Caprigno in her capacity as the Animal Control Officer for the Town of Pelham.

4. Sometime in October of 2016, Allison Caprigno came to the residence I shared with Kevin Rocheville to advise of a loose dog complaint. She told us the Pelham Police Department had received a complaint that a dog was running up the street and had chased someone. She provide us with a description of the dog. The only dog we had at that time that matched the description was Allie, who was heavily pregnant and was not even able to go up the stairs by herself. I had been personally carrying Allie up and down the stairs and caring for her and I knew that she had not been outside, let alone running down the street chasing someone.

1

5. The next time I had contact with Allison Caprigno was the night I had to leave Kevin's residence at his request. I was very upset with Kevin and told Allison that there were a number of rescue dogs, we had been caring for, in the house. She asked if I could go to the station and provide her with some information, which I did the next day.

6. At her request, I provided Allison Caprigno with a written statement and photographs of the rescue dogs. Allison Caprigno said that she was ....not after me and I would not get into trouble no matter what happened..... While there, I felt that the Pelham Police Department was "getting carried away" with this situation regarding Kevin and the dogs.

7. At the time there were approximately 40 dogs at Kevin's residence and while it was challenging to do so, we took care of all of them and tried to assist the rescue agencies with finding them homes. Kevin wanted very much to ensure that the rescue dogs would be safe and took so many rescue dogs into his home because the rescue agencies were telling him that the dogs were in danger of being euthanized.

8. The next time I had contact with Allison Caprigno was about one to two weeks after I met with her at the police station. She called me and asked if I knew where Kevin was. I told her we both have iPhones and the tracking application showed he was nearby in town working. After this, I received five to seven more phone calls from Allison Caprigno asking where Kevin was. I only spoke to her about two to three times and advised her that according to the iPhone tracking app he was nearby working.

9. Unfortunately, during this time, I never received much information as to how the rescue dogs were doing. I sent her an email to check the well-being of the rescue dogs because I hadn't heard from her with regard to them. At this point, I felt as if Allison was more interested in what Kevin was doing rather than the welfare of the rescue dogs. I felt as if our communication was so she could just get information about Kevin and not to help the rescue dogs.

10. Shortly before the search warrant was conducted at Kevin's residence, Allison Caprigno called me and asked if I knew where Kevin was. I told her that I did not as he had turned off the location setting on his iPhone and now I was not able to determine where he was.

11. After this conversation, the phone calls from Allison Caprigno started to taper off. She only called me one or two more times and I advised her that I was still not able to track Kevin and the phone calls from her stopped.

12. During my continued dealings with Allison Caprigno, it was clear to me that she did not like Kevin Rocheville. I felt the animosity Allison Caprigno had toward Kevin was personal. I felt that she was out to get him and was trying to use me to assist her in doing so.

13. Allison Caprigno told me that Kevin Rocheville was a "vicious little man".

Dated: September 2, 2021

_____
Michele Stone

STATE OF NEW HAMPSHIRE
COUNTY OF HILLSBOROUGH

Personally appeared the above-named Michele Stone, this 2nd day of September, 2021, and made oath that the within statements made by her are true to the best of her knowledge and belief.

Before me,

_____
Notary Public/Justice of the Peace

LISA M CENSABELLA
Notary Public - New Hampshire
My Commission Expires Aug 4, 2026

3

UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF NEW HAMPSHIRE

Kevin Rocheville, )
)
v. )
)
Thomas Goulden, Matthew Keenliside, ) Civil Action No. 19-CV-01169-PB
Brian McCarthy, Joseph O'Roark, )
Michael McCall, Allison Caprigno, )
Jody Harris-Stern, John Does, )
Jane Does and Town of Pelham, NH )
)

## AFFIDAVIT OF KAREN DEVORE

KNOW ALL MEN BY THESE PRESENT, that I, Karen DeVore, of DeLand, FL, under oath depose and say as follows:

1. I reside at 433 Berwick Circle, DeLand, FL, 32724.

2. For the past ten years I have been actively involved with rescuing dogs. I have worked with my veterinarians regarding how to treat and care for dogs with various medical conditions.

3. Prior to March of 2016, I was employed with Furbridge Animal Rescue based out of Westchester County, NY. Here I held the position as the Vice President and a Volunteer for one year.

4. In March of 2016, I left the Furbridge Animal Rescue to start my current animal rescue agency, Whispers of Our Forgotten Animal Rescue, Inc. I have been operating as the President and Co-Founder of this organization since April, 2016.

1

5. I first came into contact with Kevin Rocheville while I was a volunteer at Furbridge.

6. Since 2015, I have worked with Kevin to preserve the welfare of dogs who are in need of a permanent or temporary home. Kevin has been an amazing asset to the rescue agencies, often taking in numerous rescue dogs at once. It has been my observation that all Kevin has ever wanted to do was help and love abused and abandoned dogs. He could get dogs that were so broken, they were ready to be put down, to trust him and to love him. This really says a lot about his character and his work fostering rescue dogs.

7. I first became involved with the despicable situation between Kevin and the Pelham Police Department in October of 2016. At this time, Kevin had one of our dogs, Ally who is a Rottweiler mix. Ally was pregnant and delivered during the time Kevin was caring for her. The Vice President of our Rescue, Mary Anne Veres of Long Island, NY, contacted Animal Control Officer (ACO) Allison Caprigno prior to the rescue dogs being seized, on October 14, 2016, because she had received information from another rescue that there was an issue with some of the dogs we had placed at Kevin's home. On October 18, 2021 which was the week after Mary Anne spoke with her, ACO Caprigno seized Ally and her puppies from Kevin's residence. We were never notified by ACO Caprigno of the seizure. We found out from others, who had seen the newspaper and television news broadcasts and were talking about it on the internet.

8. As President of the Rescue, I contacted ACO Caprigno as soon as I heard of the seizure. She took my information and said she would get back to me in a "couple of days" as she was going through all kinds of emails and phone messages of people and rescues who were claiming to be the legal owners of the rescue dogs.

9. More than a "couple of days" went by so I contacted the police department to speak with ACO Caprigno to check the status of our rescue dogs. Unfortunately, I cannot remember the exact date, that I attempted to contact her. I was put through to Prosecuting Attorney Michael McCall. During our first telephone conversation, he told me that he really didn't know what was going on and that he was not "up to date" on the case as he had just received it not long ago (approximately a week or two). At this point, I considered our dogs and our Rescue to be victims and that the State was representing us. I soon found this to be a figment of my imagination. Attorney McCall advised that he believed our paperwork had been falsified as they were getting information from a rescue in NY, Looking Glass Animal Rescue run by Jodie Stern-Harris, which vilified us. We were made to jump through hoops and were given no information on our animals, other than they were in a better setting than they had been with our foster home.

10. During my interaction with ACO Caprigno and Attorney McCall, they could not say enough bad things about Kevin. I do not remember their exact words but Attorney McCall was very upset that I was still in contact with Kevin and both he and ACO Caprigno had nothing nice to say about Kevin and constantly made derogatory remarks about Kevin and his character.

11. Throughout this situation, we were lied to about the dogs and given NO pictures, medical information or anything. This deceit continued even after Attorney McCall went to court. The dogs were to be released from evidence and returned to their owners. He berated me for wanting to go over the charges that were incurred while the police department had our dogs. He repeatedly told me he didn't know anything about our rescue dogs and when I insisted that he provide a detailed accounting for all costs incurred, he tried to bully us and said that none of the other rescues had a problem with the amount they were charged.

3

12. This, on the heel of stating that everyone else had turned their dogs over to the Court and that their dogs were going to a rescue in New Hampshire. He was pressing hard for us to relinquish our rights to our dogs as well as stating that if we took them, we were letting the accused get away with not having to account for his deeds through restitution. Again, we were pushed back and they refused to return our dogs. We did not receive our dogs back for approximately another month, running up the boarding and medical bills to approximately $2,991.00.

13. Through this entire situation, we were given no information on our dogs. Once we paid the fees, we were still not given any access to medical records of our dogs. When we finally did get the medical records, we were dismayed to find that one of our nine of dogs, who had been in the care of the Hudson ACO and was just a puppy, had been poisoned as a result of the ACO's careless handling of cleaning materials.

14. When Ally, the mother of the puppies, was taken into custody on October 18, 2016, it was recommended that she have a skin scrape done to rule out mange versus poor care. The skin scrape was not done until six weeks after the recommendation. We were not privy to any of this information so that we could assist in the care of our dogs. Instead, they were made to suffer needlessly due to the inadequate care they received from the ACOs. Ally's skin condition, since being removed from Kevin's residence, had worsened due to the lack of care of the Pelham Police Department.

15. It is my opinion as a long-time, educated rescue coordinator, that the Pelham Police Department committed gross negligence verging on animal cruelty while the animals were in their care. The rescue dogs were better cared for when they were at Kevin's residence. He

had purchased additional medicine for them and paid for numerous veterinary bills in order to ensure that the rescue dogs were cared for properly.

16. Kevin was known as the "go to" person for many rescues, to include Looking Glass Animal Rescue, who at one point had placed ten or more rescue dogs with Kevin. When no one else would take a dog or there was a problem with another rescue in New Hampshire, they would turn to Kevin for help and he would oblige for the good of the dogs and to keep them safe.

17. I would like to reiterate the fact that during my interactions with Kevin, I found him to be a caring and giving person who got dogs that were so broken that they were ready to be put down, to trust him and to love him. This speaks volumes for his character and we were lucky to have someone like him to take care of those rescue dogs in the most need.

Dated: September 16, 2021

_____
Karen DeVore

STATE OF ~~NEW HAMPSHIRE~~ Florida MB
COUNTY OF ~~HILLSBOROUGH~~ Volusia MB

Personally appeared the above-named Karen DeVore, this 16th day of September, 2021, and made oath that the within statements made by her are true to the best of her knowledge and belief.

Before me, Makayla Brown

_____
Notary Public/Justice of the Peace



Notary Public State of Florida
Makayla Brown
My Commission GG 312907
Expires 03/18/2023